## COLORADO COUNTY v. TRAVIS COUNTY et al. (No. 623.)

(Court of Civil Appeals of Texas. Amarillo. March 17, 1915. On Motion for Rehearing, May 8, 1915.)

1. PUBLIC LANDS ⊙〰175—SCHOOL LANDS— BOUNDARIES — POWER OF COMMISSIONERS' COURT.

The commissioners' court of a county has implied power to fix the boundaries of its school lands by express agreement, such power being necessary in order to carry out the object of the grant of the lands to the county in the event of sale.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. ⊙〰175.]

2. PUBLIC LANDS ⊙〰175—SCHOOL LANDS— BOUNDARIES — ESTABLISHMENT BY AGREEMENT.

Where the representatives of several counties made a joint survey of their school lands, the commissioners' court of each county, with knowledge that the survey was joint, adopting the reports of its particular representative in regard to the lands of each, and the attorney for one of the counties, in a suit involving the boundaries of the lands, abandoning any contention against another county on account of the disclaimer of its attorney as to certain lands not given it by the joint survey, the facts did not show settlement of the location of the school lands by agreement.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. ⊙〰175.]

3. PUBLIC LANDS ⊙〰175—SCHOOL LANDS— FIXING BOUNDARIES—ESTOPPEL OF COUNTY.

Where plaintiff county, suing to determine the location of its school lands, had had a resurvey made for the purpose of subdividing and selling such lands, and where fences had been built in reliance upon such resurvey by the lessees of defendant counties, with the acquiescence of plaintiff county, and there had been reliance upon the boundaries of such resurvey by defendant counties in other suits, whereby one of such defendant counties lost part of its school lands, there was no estoppel against plaintiff county precluding it from claiming boundaries to its school lands other than those set by its own resurvey, since, as to the suits subsequent to the survey, defendant counties had no right to rely upon plaintiff county's conduct, while the general policy of constitutional and statutory enactments, with reference to the disposition of public school lands, as well as numerous decided cases, has narrowly limited the power of the trustee county in dealing with such lands.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. ⊙〰175.]

4. BOUNDARIES ⊙〰48 — ESTABLISHMENT — AGREEMENT—ACQUIESCENCE.

An agreement fixing a boundary may be implied from acts and long acquiescence, especially if a failure to recognize such boundary would result in injury to subsequent purchasers, or where one of the proprietors has made valuable improvements induced by the acts and acquiescence of the other owner.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 232–242; Dec. Dig. ⊙〰48.]

**5. ADVERSE POSSESSION ⬡⟿7 — OPERATION AGAINST COUNTY—SCHOOL LANDS.**

Statutes of limitations do not apply to settle title to unlocated school lands as against a county holding and disposing of such lands granted it by the state in trust for purposes of education, since in such case the county acts practically as an agency for the state, against which such statutes are inoperative.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 24–42; Dec. Dig. ⬡⟿7.]

**6. PUBLIC LANDS ⬡⟿175 — SCHOOL LANDS — LOCATION—EVIDENCE.**

In an action between counties to locate school lands, where certain surveys, as to the location of certain monuments in a prior survey, were in close accord with such survey, an instruction forbidding the jury to consider such subsequent surveys as evidence of the location of the monuments was erroneous.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. ⬡⟿175.]

**7. PUBLIC LANDS ⬡⟿175—SCHOOL LANDS— LOCATION—EVIDENCE.**

In an action by a county against others to locate its school lands, where the field notes of a junior survey did not suggest that the surveyor knew anything about the school land tracts, the only connection between it and another senior survey locating the lands being that in the junior survey one corner of a survey lying north of the school tracts was located, such junior survey was not admissible under the rule that such a survey may locate a senior survey when the latter is involved in doubt.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. ⬡⟿175.]

**8. TRIAL ⬡⟿48 — REVIEW — EVIDENCE INADMISSIBLE IN PART.**

Where testimony inadmissible in part is offered as a whole, error cannot be predicated upon its rejection.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 120; Dec. Dig. ⬡⟿48.]

**9. PUBLIC LANDS ⬡⟿175—SCHOOL LANDS— LOCATION—SUFFICIENCY OF EVIDENCE.**

In an action by a county against others to locate its school lands, evidence *held* sufficient to sustain the jury's finding as to the position of the southeast corner of a certain survey.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 555–570; Dec. Dig. ⬡⟿175.]

Appeal from District Court, Baylor County; Jo. A. P. Dickson, Judge.

Action by Colorado County against Travis County and others. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

Sporer & McClure, of Jacksboro, J. A. Wheat, of Seymour, and J. J. Mansfield and A. A. Gregory, both of Columbus, for appellant. Jno. E. Shelton and Batts & Brooks, all of Austin, Warren & Briggs, of Gilmer, D. A. Holman, Glasgow & Kenan, and D. F. Goss, all of Seymour, Garnett & Garnett, of Gainesville, and T. J. Wright, of Throckmorton, for appellees.

HENDRICKS, J. Colorado county, the appellant herein, instituted this suit against Travis and Upshur counties, and against various individuals, and is one of boundary, involving the location of the school lands of said counties. In 1854, Gen. Hudson, a sur-

veyor, located the school lands of the counties mentioned in the shape of a parallelogram, the Travis county four leagues being situated in the southeast corner of said parallelogram, with the Colorado county four leagues situated in the northwest corner, and the Upshur county four leagues being divided in two tracts of two leagues each, one in the northeast corner and the other in the southwest corner of said parallelogram, so that the south Upshur tract lies immediately west of the Travis county school land and south of the Colorado county tract, with the north Upshur tract situated immediately east of the Colorado tract and north of the Travis county tract, hence the south line of the Travis county land and the south Upshur tract is identical and coterminous, and the north line of the Colorado county school land and the North Upshur tract is identical, and coterminous on the north. Gen. Hudson being deceased, certain interrogatories, propounded to him in another suit, with the answers thereto, were in evidence in this cause. The survey of these lands, as indicated by the original field notes, and the testimony of Gen. Hudson, was intended to connect with the Old Colony line on the south; and he testifies that preliminary to making the several surveys, two assistant deputy surveyors went to Victoria Peak, in Montague county, about the northeast corner of the Peters Colony surveys and traced the north line of said Colony surveys some 20 or 25 miles; that thereafter Hudson, assisted by one of the deputies, continued tracing this north line of the old Colony work perhaps into Clay and Archer counties, and the school land surveys mentioned were comprehended within a system of 15 surveys numbered from 1 to 15, Gen. Hudson testifying that he intended to connect, and make the surveys of this system, dependent upon each other. In their numerical order, this surveyor, previous to the location of the school land tracts, located what is designated in this record as the Calvin Farmer survey, the H. H. Haggood survey, and the I. G. Good survey, with the north Upshur and the Travis county school land tracts, intended by him to be located east of said three last-named surveys, the I. G. Good also to be connected on the south with the north line of the Old Colony work. Two or three years after these surveys had been made, on account of some of the certificates not having been applied for, for the purpose of covering a part of the work, Gen. Hudson made an office survey of the Polk county school land, making the southeastern portion of same rest upon the north Colony line, tying it to the Good survey and also to the Haggood and the Calvin Farmer, making a part of the Polk project north of the Calvin Farmer and ostensibly joining it to the north Upshur school land tract, at a point where the northeast corner of the Calvin Farmer was presumably situated in the east line of

said north Upshur tract. This block of four school land surveys (the Upshur divided into two tracts) was located on the east side of the Salt fork of the Brazos river, a part of the same on the north being situated in Baylor county, Tex., and on the south in Throckmorton county, Tex., and at a time when Cook county comprehended the particular territory.

The following constitutes the field notes of the particular school land tracts:

Travis county tract:

"Beginning 1,944 vrs. north of the S. W. corner of a one-third league survey, No. 9 stake, from which a mesquite mkd. X brs. S. 44½° W. 28 vrs., another forked mkd. X brs. 12° W. 44 vrs.; thence west 10,000 vrs., pile of stone, from which a mesquite mkd. X brs. N. 64° W. 35 vrs., another mkd. X brs. S. 100 vrs., round mound brs. S. 18½° E. 2,200 vrs. [not 220 vrs. as stated in appellant's brief]; thence south 10,000 vrs., stake in prairie, from which a mesquite mkd. X brs. S. 40° E. 40 vrs., another forked mkd. X brs. S. 6½ vrs.; thence east 10,000 vrs., stake on the N. B. line of Col. Sur.; thence north, at 1,283 vrs. pass S. W. cor. of a 1,280 Sur. No. 7, at 10,000 vrs. place of beginning."

Colorado county tract:

"Beginning at the northwest corner of a 4-league survey made for Travis county for school purposes, a pile of stone, from which a mesquite marked X bears north 64 degrees west 35 vrs., another marked X brs. south 73 degrees west 100 vrs., round mound brs. south 18½ degrees east 2,200 vrs.; thence south 5,000 vrs., corner pile stone, from which a mesquite marked X brs. north 19 degrees west 4 vrs., another marked X brs. south 31½ degrees west 15 vrs.; thence west 10,000 vrs., a stake in prairie; thence north 10,000 vrs., stake in prairie; thence east 10,000 vrs., stake, from which a mesquite marked X brs. north 49 degrees west 9 vrs., another marked X brs. north 15½ degrees west 25 vrs.; thence south 5,000 vrs., the place of beginning."

North Upshur county tract:

"Beginning on the west line of No. 9, a stake, the N. E. corner of a four-league survey of school land for Travis county, from which a mesquite brs. S. 12° W. 44 vrs., another brs. S. 44½° W. 28 vrs.; thence N. 3,243 vrs. creek, 5,000 vrs. a stake, from which a mesquite brs. N. 8° W. 71 vrs., another 3-pronged brs. S. 37½° W. 25 vrs.; thence west 10,000 vrs. to a stake from which a mesquite brs. N. 49° W. 9 vrs., another brs. N. 15½° W. 25 vrs.; thence S. 1,150 vrs. a ravine, 5,000 vrs. a pile of stone, from which a mesquite brs. 64 degrees W. 35 vrs., another brs. S. 73° W. 100 vrs., a round mound brs. S. 18½° E. 2,200 vrs.; thence 10,000 vrs. to the place of beginning, bearings marked X."

South Upshur county tract:

"Beginning at 5,000 vrs. S. of the S. W. corner of two leagues surveyed for Upshur county school land, a stake from which a mesquite marked X brs. N. 19° W. 4 vrs.; thence W. along the S. B. line of a four-league survey made for the Colorado county school land, 10,000 vrs., to its S. W. corner; thence S. 5,000 vrs., corner, a stake; thence E. 10,000 vrs., a stake from which a mesquite marked X brs. S. 40° E. 40 vrs., another marked X brs. S. 6½° W. 40 vrs.; thence N. 5,000 vrs. to the beginning."

The I. G. Good, a rectangular survey, with its length upon the north Colony line, is situated south of the Haggood, also a rectangular shaped survey, which latter, by consider-ing the field notes of the Travis and Farmer together, is situated with its length ostensibly east of the Travis, and with the Calvin Farmer north of the Haggood, with its length (shorter than the Haggood) also east of the Travis and east of a portion of the north Upshur. The Calvin Farmer is also known as survey No. 9, and is called for by that number in the Travis field notes; and survey No. 7, mentioned in said Travis county location, is also the same as the Good survey.

The Calvin Farmer survey No. 9, according to its field notes, begins at the northwest corner of the Haggood survey No. 8. The Peters Colony surveys on the south are also known as the Texas Land & Immigration Company surveys; and the north line of the Colony only extends west coincident with the south line of the Travis county school land about half the distance with said Travis line, and the south line of the South Upshur tract, west of the Travis tract, is identical with the north line of the Colony, only by a western prolongation of the latter line to the southwest corner of the Upshur tract.

When Gen. Hudson located the Travis, Colorado and Upshur county surveys, there were no older surveys contiguous thereto in that country, with the exception of the Peters Colony, and the previous work mentioned as having been made by him according to the numerical order. The mesquite bearing trees called for in the field notes on the south, and on the east are not to be found at this time unless a three pronged mesquite marked X may be considered as the Northeast corner bearing tree of the North Upshur tract, which however, was submitted to the jury as a bearing tree, and rejected by it for that purpose.

It is to be noted that the Travis county school land field notes call for the northwest corner of that survey east of the northeast corner, and for a pile of stone for said northwest corner, "from which a mesquite marked X bears north 64° W. 35 vrs.; another (mesquite) marked X brs. south 73° W. 100 vrs.; a round mound brs. S. 18½° E. 2,200 vrs."

Travis and Upshur counties, aside from the question of agreed boundary, estoppel, and acquiescence, contend that the true northwest corner of the Travis county school land may be established and should be located, in accordance with the bearing call for the round mound, which they assert may now be ascertained as existent upon the ground in the territory where the northwest corner of said survey should be situated; and as corollary to this they also contend that the testimony, to the effect that a mesquite tree, or stump, enveloped by a second growth, and marked X, standing N. 64° W. 35 varas, from a corner which could be ascertained by the round mound, 18½° east, distant about 2,200 varas, aids the location of said northwest corner by said round mound. The jury,

however, on the submission of special issues, rejected the round mound and the mesquite, as contended for by Travis and Upshur counties, as the bearing calls for the location of the northwest corner of the Travis county school land; also finding against the so-called Jones corner contended for by Colorado county as the northwest corner of said tract.

The trial court asked the jury if they could state from a preponderance of the evidence the location of any original line, corner, bearing tree, or mound, as called for by Gen. Hudson, the surveyor, and the jury answered that they could locate the south line of the Travis county school land as the north line of the Colony survey, called for by said original surveyor; and also answered, as stated, that the southeast corner of said Travis county school land survey was situated, "312 vrs. E. of the N. W. corner of Colony survey No. 3039," which latter finding Travis and Upshur counties insist was not properly found by the jury on account of the weakness of the testimony as proof of such fact; also urgently insisting that the finding against the round mound and mesquite marked X as proof of the northwest corner of Travis according to their theory, was against the strong preponderance of the testimony.

Travis county pleaded that it did not claim, and was not in possession of, any lands except those included in the survey as made by the original surveyor. It also alleges that Colorado county, the plaintiff herein, more than 30 years prior to the institution of this suit authorized its surveyor, one D. W. Jackson, to ascertain the common boundary between it and Travis county, and authorized him to mark the boundaries of the Colorado county school land with permanent monuments for the purpose of the subdivision and sale of its said land, alleging the execution of the work by Jackson on the ground and the report of the same to the commissioners' court of said Colorado county, and the ratification and adoption of the same by the commissioners' court of said county, which allegations are fully sustained by the proof. Travis county also alleged that it had approved and adopted this survey, and had acquiesced in and agreed to the location of said line as marked on the ground by Colorado county, and that in reliance upon the action of the latter county Travis had erected valuable fencing on its own land, which would become the property of Colorado county, if the location of said line should be changed.

In 1894 one Maddox instituted a suit against Travis and Upshur counties, asserting that the Travis and south Upshur county school land should be moved further north and west, and that a certain intervening vacancy existed for the benefit of the plaintiffs. In that suit Travis and Upshur counties made Colorado county a party thereto,

alleging that if they lost any of their land on account of the contentions of Maddox, that Colorado county should respond accordingly; and this record shows that in 1894, during the pendency of that suit, Travis and Colorado counties commissioned certain surveyors to resurvey the county school land of each as a matter of preparation for defenses to be used in the trial of said cause; the record showing that the same Jackson, who had resurveyed the land for Colorado county in 1882, in 1894 collaborated with one Wallis, the Travis county surveyor, assisted by one Howren (the latter also employed by Travis county), in resurveying the said school land tracts; the representatives of each county reporting their work to their respective counties, which resurvey almost conformed to the Jackson work performed by him in 1882. Travis county pleaded that the respective counties, in approving and ratifying the joint work and location of said line, did so for the purpose of settling said disputed and doubtful boundary, and of enabling Colorado county and itself to make a common defense, in said litigation then pending, and in reliance thereupon abandoned its contention that said line should be located further west than Jackson located it in 1882, and the three surveyors, in 1894, had placed the same; Travis county also asserting that said line as so located, by valid and binding agreement, as well as by practical location, acquiescence, and estoppel, was then, and since, made the division line of said Colorado and Travis county lands, and of the Travis county and Upshur county lands, Upshur county having been a party to said Maddox suit.

Upshur county, among other things, pleaded practically the same facts for the purpose of raising agreed boundary, connecting itself with the joint survey, likewise estoppel and acquiescence, as alleged by Travis county; further alleging that on the faith of the acceptance of the location of the Jackson, Howren, and Wallis line in 1894, by Colorado county, it had subsequently defended certain lawsuits involving the location of the lines on the south and on the east, which suits would have been lost but for its reliance on the action of Colorado county in accepting and marking said line as the correct line; also contending that relying upon the disclaimer of Colorado county and the admission of Colorado county in the said Maddox suit in 1894, as to said Jackson, Howren, and Wallis line, it had failed to make Colorado county a party to said subsequent suits, which otherwise it would have done.

Upshur and Travis counties introduced in evidence the records of Colorado and Travis counties, in connection with and comprehending the resurveys of the different surveyors, the pleading and judgments of all the suits mentioned (including two suits against Upshur county, wherein it lost cer-

tain land), with some additional oral testimony as to the conduct of the representatives of said counties, referable to all of said suits, with testimony of some fencing constructed by the lessees of Upshur and Travis counties (the fencing to become the property of the lessors at the expiration of the leases) a part of said testimony offered, we take it, for the purpose of proving the original survey of Gen. Hudson, and all of it for the purpose of proving acquiescence and estoppel, and the principal part of it for the purpose of establishing agreed boundary.

The lands of the three counties were all leased to the same lessor, who fenced the same, and the jury specially answered that Travis county did not cause its lessee to erect certain divisional fencing between it and Colorado county, relying upon the Jackson line marked in 1882, but did answer that Upshur county caused its lessee to erect valuable fencing on the western part of the S. Upshur survey on a certain line, relying on the action and approval of Colorado county as to said Jackson survey. The jury also answered that Travis county, knowing of the approval by Colorado county of the resurvey of Jackson, Howren, and Wallis, in 1894, and in reliance on the action of said county, and for the purpose of settling the location of a doubtful and uncertain boundary, accepted said resurvey as correct and abandoned their claim (we presume referring to the Maddox suit), for the location of said line at a point further west and north. The jury also found, as answers upon special issues, that Upshur county, with knowledge of the action of Colorado county, in accepting said survey, and with knowledge of the disclaimer of Colorado county, filed in the Maddox suit, and in reliance upon said actions, accepted the location of the lands by Jackson, Howren, and Wallis, as correct, and by reason thereof predicated its defense of two suits subsequently filed against it, upon the location of the mound corner as established by the resurveys.

The trial court, on account of these latter findings by the jury, rendered judgment against the contentions of Colorado county for a course and distance construction 312 varas east of Colony survey 3039; and the latter county by numerous assignments, aided by many propositions, presenting its position in different phases, is seriously insisting that neither agreed boundary, estoppel, or acquiescence is proven in the cause; and again, though if proven as between individuals, however, as a matter of law, counties, as municipal subdivisions of government on account of the character and tenure of the lands held by it for school purposes, are unable to agree to, or acquiesce away, or become estopped, by virtue of which it would lose or become divested of any part of its school land.

[1-3] We think that the commissioners' court of a county could, where the condition demanded it, make an express agreement with reference to its boundaries. It is true that the Eighteenth Legislature (Acts 1883, p. 28) declared that county school land surveys, either made upon the ground, or by protraction, includes the lands within the lines of the surveys vesting said lands in the counties for which the surveys were made; and also predominated the calls for distance over calls for rivers or natural objects, when the former would give the amount of land intended and the latter would not where a vested right is not divested. Notwithstanding this statute, the location of a county school land survey may be in such doubt and uncertainty as that the sale or disposition of same, or a part thereof, could not be made, and the beneficial and public purpose for which the land was granted could not be effectuated on account of the troublesome condition of the boundaries of the land. An express power always carries with it, by necessary implication, every other power necessary and proper to the execution of the power expressly granted; and this elementary canon of construction was applied as to state public school lands by the Supreme Court, in the case of Imperial Irrigation Co. v. Jayne, 104 Tex. 395, 138 S. W. 582, Ann. Cas. 1914B, 322. That case, without extensively analyzing it, was one dealing with and also conceding an implied grant of an easement in the public school land to an irrigation company, the court construing an act of the Twenty-Ninth Legislature with reference to the application of the public waters of the state for irrigation, and providing for the formation of corporations with power to construct and maintain dams, reservoirs, and ditches for irrigation purposes; and the act was held by the court as implying the grant as effectuating the purpose of the act. The application of that case and the reasoning of Justice Dibrell, by analogy, to sustain the implied power of a commissioners' court, under appropriate conditions, to expressly agree to the boundaries of its lands in order to carry out the object of the grant, we do not think is weakened by the vigorous dissent of Chief Justice Brown, but if anything, as applied to this status assumed by us, is strengthened. We are unable to agree, however, with the appellees, that an agreement upon the facts as presented in the record, for the purpose of settling boundary generally between Travis and Colorado counties, was made by said counties. It is true that the representatives of each county, during the pendency of the Maddox suit, made a joint survey; also probably true that the commissioners' court of each county knew that the same had been made, and with such knowledge adopted the reports of each representative in regard to the resurvey of the lands of each; and it is likewise true that the professional representative of Colorado county, in that cause, disclaimed any land except as included within the Jackson, Howren, and Wallis survey;.

and that Travis county may have abandoned any alleged contention against Colorado county in that cause on account of said disclaimer. But the judgment in that cause was in favor of the defendant counties, and there was no judicial settlement of boundary between Colorado, Travis, and Upshur counties. Of course it is not contended by Travis and Upshur that the result of the proceedings was res adjudicata; but the action of the surveyors, and the counties adopting the same, in connection with the legal proceedings, and the action of Judge Doom, is attempted to be broadened by appellees, if we correctly interpret their briefs, as a definite settlement of the lines between the counties. Primarily, the resurvey was ordered by Colorado and Travis counties, in preparation of a defense against Maddox, and though there was involved the cross-action against Colorado county and the latter's resistance to the same, we think it is strained to develop the actions of the representative surveyors and the counties' adoption thereof, in connection with the legal proceedings, and the statement of Judge Doom, as an agreed boundary for all purposes binding the parties thereto for all time. If, in that very cause, it had become apparent to Judge Doom representing Colorado county, after he had filed his disclaimer, that another and different line was ascertainable, advantageous to the interest of his client, and that the Jackson, Howren, and Wallis line was incorrect, we think it clear the same could have been pleaded (unless precluded by negligence); and that Travis county could not have withstood an amendment on the theory that an express or implied agreement upon the facts as to boundary had been made. Aside from the question of agreed boundary, the appellees assert that the resurvey by Jackson, as the representative surveyor of Colorado county, made in 1882, under the authority of the county for the purpose of subdividing and selling the land, with the building of the fences, as shown by the record, by the lessees of Upshur and Travis counties, with the long acquiescence by Colorado county and the reliance upon the same by the other two counties, with the loss by Upshur county of a part of its land in other suits, wherein Colorado county's position in the Maddox suit was relied on, constitute estoppel or acquiescence as against Colorado county. Neither are we persuaded as to the soundness of this position. While, as said by the Supreme Court, in the cause of Delta County v. Blackburn, 100 Tex. 55, 93 S. W. 420:

"The power to sell or dispose of the lands in the manner to be provided by the commissioners' court, is comprehensive and carries with it the right to do all things incidental to its proper exercise; but that provision of the Constitution must not be extended beyond its proper sphere of operation and made the pretext for doing things inhibited by the other rules prescribed which must also be respected in determining its scope."

A study of the constitutional and statutory enactments, with reference to education, and the dispensation of public school lands for the benefit of counties from the time of the Republic to the present time, suggest in a general way limitations of power, as well as by numerous decisions in particular instances as to the trustee handling the subject of the trust.

The first act of the Texas Congress, for the establishment of a general system of education, prescribed that the three leagues of land granted to the counties should not be leased for a longer term than three years.

The act of February 5, 1840 (Laws 1840, p. 146) by the Fourth Congress of the Republic, broadened this by declaring that the chief justice and two associate justices of each county of the Republic, as an ex officio board of school commissioners, had the power to receive as well as to sell and convey the school land for educational purposes. The power was again narrowed by the first Constitution of the state, in 1845, and the second Constitution in 1861, providing that the county school lands should not be alienated in fee, "nor disposed of otherwise than by lease for a term not exceeding twenty years in such manner as the Legislature may direct." The Constitutions of 1866 and 1869 provided that the proceeds of the county school land should be added to the public school fund— the former, however, declaring that the counties should receive the full benefit of the interest arising from a sale of the lands, and that the same should not be sold without the consent of the counties; the latter Constitution being silent upon the subject, both of which were construed in the cases of Galveston County v. Tankersley, 39 Tex. 651, and Worley v. State, 48 Tex. 1, the latter limiting the extent of the holding by the former.

In the case of Webb County v. Board of School Trustees, 95 Tex. 137, 65 S. W. 880, Chief Justice Gaines said, that the county school funds provided by the Constitution of 1876, "were to supplement the portion of the general available fund of the state which should be set apart to the respective counties," and that this is made clear by the declaration that "the lands and proceeds, when sold, shall be held by said counties alone as a trust for the benefit of public schools therein." Not only the funds but the lands are held in trust for a public purpose.

The schools "are institutions of the state established in the counties and, as a part of the state's governmental policy, maintained, in part, * * * from the interest upon the funds realized from the lands intrusted by the state to the management of the commissioners' courts of the counties as instrumentalities in executing that policy." Delta County v. Blackburn, 100 Tex. 58, 93 S. W. 422. Justice Williams also said in that case, that "The counties are thus trustees for the

benefit of state's public schools, and suits brought by such trustees to protect the funds of which they have the control for the purpose of the trust are practically suits in behalf of the state," and held that limitation did not run against the county as trustee of school funds, in recovering installments of interest on account of the governmental nature of the trust. The expenses of locating the county school lands are chargeable against the general revenues of the county only, and the commissioners' court has no authority to compensate the locator for services with a part of the land. Dallas County v. Land & Cattle Co., 95 Tex. 207, 66 S. W. 294; Logan v. Stevens County, 98 Tex. 283, 83 S. W. 365.

If a part of the consideration for the sale of the county's school lands is the release of a claim for damages against the county by the purchaser, the sale is void. Taber v. Dallas County, 101 Tex. 241, 106 S. W. 332.

The county has to sell the land; it is unable to delegate the authority to an agent if the latter is to exercise discretion in the sale; and this is true notwithstanding a resale to an innocent purchaser. Logan v. Stephens County, 98 Tex. 283, 83 S. W. 365. The case of Midland County v. Slaughter, decided by the Court of Civil Appeals of the Second District, 130 S. W. 612, was one involving a lease of the county school land for twenty years, with the option to purchase, which the court, by majority opinion, held void. The court said, construing the Constitution:

"It must follow, * * * as in the case of other trustees, that in the * * * disposition of the county school lands the commissioners' court can exercise only such authority as has been expressly, or by necessary implication, granted."

It held the option in that case an unreasonable one and void; and the Supreme Court denied the writ of error.

While the language of Chief Justice James, in the case of Atascosa County v. Alderman, 91 S. W. 847, is broad enough to deny the power to a commissioners' court to expressly agree upon boundary, however, we think that case only contemplated acquiescence as proof of agreement. He said:

"What is claimed is that the circumstances connected with the inclosing of the school lands by a tenant and taking in the strip in controversy are sufficient to admit of a presumption of an agreement between the county and the adjoining owner for a common line. The county was unable to acquiesce itself out of the title to any of its school land. The doctrine of agreed boundary is founded (in that cause) on the idea of an agreement to be inferred from circumstances, mainly acquiescence for a long time, and as a county is unable, through acquiescence, to part with its land, an agreement presumed from acquiescence would not be binding on the county, and would therefore not bind the other party."

Of course it may be that individuals may develope numerous acts and manifestations into an implied agreement of boundary.

"The doctrine of acquiescence, as applicable to common boundary lines, usually has its foundation in lapse of time and matters in pais, and may be stated as follows: Where a particular line has been acquiesced in, or recognized by, adjoining owners as their common boundary, that affords a strong presumption that it is the true line. While the presumption is strengthened by lapse of time, yet no period has been fixed that will render such presumption conclusive; other considerations than the lapse of time must be considered. In this respect each case must be determined by its own particular circumstances. Floyd v. Rice, 28 Tex. 341." Medlin v. Wilkins, 60 Tex. 413.

[4] It is generally held that an agreement may be implied from acts and long acquiescence in regard to a boundary line, especially if a failure to recognize it would result in injury to subsequent purchasers, or where one of the coterminous proprietors has made permanent and valuable improvements induced by the acts and acquiescence of the other owner. Hefner v. Downing, 57 Tex. 580. We are not attempting to lay down any rule in this case, but we are of opinion that Colorado county, upon this record, would be neither estopped, under the law nor upon the facts, on account of having marked its line in 1882, nor because it used the resurvey thereof in 1894, nor on account of the building of the fences; nor has it acquiesced itself out of any land which it may otherwise own. Irby, the manager of the old Hash Knife ranch, and who was in charge of the same when the school lands of the three counties were leased, and who built the fences testified that he did not know of the Jackson survey made in 1882, or of any stones indicating the same, but that he placed the fences, including the division fence, where pointed out by some surveyor. The jury held against Travis county on the question of fencing, and in favor of Upshur on the same question, though we are unable to give any stronger force to the testimony upholding the contention of the latter county than the testimony rejecting the contention of Travis county. The division fence was not on the line, but Travis contends that, considering the public road for a part of the way, and the situation of the fence from the point where the road leaves it, the fence conformed to the line in such a substantial manner as that it should be presumed a division fence built to Jackson's line. Any surveyor who would point out, especially at that time, a division line, would, in accordance with Hudson's field notes referable to the round mound, suggest about such a line as Irby built upon, and there is no evidence of any knowledge of the stones or bearing trees of Jackson when the fences were built.

[5] The repose of titles is the public policy underlying the statutes of limitation, and which the law reverses as to subdivisions of governments in certain instances (Delta County v. Blackburn, 100 Tex. 51, 93 S. W. 419), and which the Constitution was particular to reverse as to county school lands; for the courts to deny an undisturbed claim to land where the county is administering it. solely as a trust where no agreement of.

boundary is proven, but at best mere acquiescence for a great length of time, is within the the spirit of the same policy of reversal.

We are not unmindful of the cases cited by appellees, viz.: Mortgage Co. v. Tubbs, 45 S. W. 625, and Krause v. City of El Paso, 101 Tex. 216, 106 S. W. 121, 14 L. R. A. (N. S.) 582, 130 Am. St. Rep. 831. In the former the Court of Civil Appeals treated the case as one where Johnson county, through its commissioner (whether as agent in selling the land or as a member of the commissioners' court, we are unable to determine), pointed out to the prospective purchaser the lines of the land upon the faith of which he purchased. In the Krause Case it was the duty of the mayor of El Paso to give a permit to build, and the city engineer to survey the lots, upon the application of an individual, and the latter surveyed the lot for an owner who desired to build upon her lot, designating the lines for that purpose, and upon the strength of the designation of the city engineer, a brick house was constructed, and for twenty years the owners paid taxes upon the property, was compelled to build and repair sidewalks relative to the lot, and the enforcement of the right of the city to the street meant a destruction of the house. In both instances the acts were affirmative, were relied upon, and valuable rights had accrued and properly considered, and even assuming that the Tubbs Case was correctly decided, we believe have no just application to the record here.

As to Upshur relying upon what Colorado did, causing it to lose some of its land in subsequent suits, in law it had no right to rely upon such conduct, and produce the same in this suit as estoppel. Colorado county did not cause it to lose the land to the successful litigants, nor is it a proper excuse why that county was not made a party to the subsequent suits.

[6] The trial court, however, in submitting the issues of the location of the lines upon the ground, as well as the issues of estoppel and acquiescence, charged the jury as follows:

"Evidence has been introduced before you concerning the alleged location on the ground of the east line of the Colorado county school land tract, and of the northwest corner of the Travis county school land tract by D. W. Jackson, in the year 1882, and concerning the location of said line and corner by D. W. Jackson, A. S. Howren, and John E. Wallace, in the year 1894, and concerning the action of Colorado, Upshur and Travis counties with reference to said work and locations.

"You are instructed that you may consider said evidence for what, if anything, you think it is worth, in answering the questions hereinafter propounded, but that in answering the questions above propounded said evidence should not be considered."

The appellees cross-assign this charge as error.

The court, in referring the jury to "questions above propounded," as to the use of the testimony in answering said questions, was referring to the special issues submitted as to the mesquite trees, the round mound, the resurveys by Jackson in 1882, and the three surveyors in 1894, in attempting to retrace Hudson's field notes, and we think, in the condition of this case, this instruction was erroneous.

Gen. Hudson said:

"To the best of my recollection the calls in said field notes for natural and artificial objects were made from actual field work. When natural and artificial objects are called for in the field notes, I found them on the ground as called for, except I sometimes called for a stake or mound for corner when I did not place it there. * * * In making the original, the bearing trees were marked generally as follows: 'X,' and I don't remember by whom, perhaps some by me, perhaps some by Brown, and perhaps some by the chainmen. * * * I generally had my surveys full, but wanted them as accurate as I could get them; but I don't think the excess in my work would be as great as 10 per cent.; but the work at that time was done very rapidly and may not be exactly correct."

Gen. Hudson did not recall making a corner for the northwest corner of the Travis county survey, but in answer to questions, whether the mound was upon his right or his left hand and as to the size of the mound, said:

"My recollection is that I was running north and the mound was on the right of me; it was a small mound the size of a hill. I don't think I measured the distance to the mound. I perhaps got the distance by calculation. I remember seeing a mound and calling for it in my block of work but I don't recollect on the line of what survey it was. I will state that in my surveying when I called for objects, either natural or artificial, they were on the ground. At the time I made the Travis, I knew the course of the north line of the Colony. * * * I intended then [or "them"] to connect with and adjoin the Peters Colony survey and to inclose the land called for in the field notes."

As indicated by the field notes of the different surveys, with the descriptive calls for natural and artificial objects, these school land surveys were not office surveys, though imperfect work. If Gen. Hudson's testimony is to be believed, his calls for bearing trees were not fictitious, and he remembered the mound, and to the best of his recollection he was going north with the mound upon his right, and did not think he measured the distance to the mound but perhaps obtained it by calculation. The testimony is undisputed that a course and distance corner of about 10,000 varas east from the round mound corner as contended for by the counties, thence north at 5,000 varas crosses Wagon Creek at exactly the distance, 3,243 varas, as called for by Gen. Hudson in his field notes.

The appellant in this cause argues that the mound, as viewed from the Jones corner, is more of a "round mound" and less misleading by considering correct surveying, than the appearance of the mound from the other corner 2,200 varas distant, as contended for by the other counties. The photographs in this record do not wholly bear out appellant's contention. The picture taken nearest

to the mound sent up in the record, indicates a round mound at the northeast end of the ridge, with a considerable depression between it and the elevation at the southwest end of said ridge. Photograph No. 4, indicating the perspective from the Howren-Wallis-Jackson corner of the mound at the east end, suggests a "round mound" with a considerable depression between it and the conical elevation on the west or the southwest connected with the former by the "saddle back." The pile of stone contended for by appellant as the northwest corner of the Travis county land suggests two mistakes in the calls: First, the call that "a round mound bears south 18½° *east*" should have been that it bore south 18½° "*west*." When Hudson said "2,-200 varas" for distance he missed the distance nearly 800 varas, according to Morgan, the surveyor. There is, as indicated by the testimony, a difference in the distance; whether obtained from the crown of the mound or at the foot of same. With good instruments, a calculation by angles to obtain the distance is practically as correct as the actual survey to the object. We presume, of course, if Gen. Hudson was going north, and did not go to the mound (and he thinks he did not), he obtained a bearing when due west of the mound, and another when he arrived at the end of his distance, and, with the base and the angles, calculated the distance to the mound, and it is rather an unusual error to miscalculate as many hundreds of varas as he would have had to have done if he had placed the corner where appellant says he did. Eliminating the mesquite marked X on the stump enveloped by a second growth, as testified to, which is in dispute as to whether Jackson in 1882 marked it, or Hudson in 1854, and also eliminating the three-prong mesquite and a pile of stone, which may be disputed, near the northwest corner of the north Upshur survey, contended for by the two counties, still the evidence is of strong probative significance, considering the calls for the round mound, in connection with the proper distance to Wagon Creek, from the northeast course and distance corner, measured from the northwest corner of the Travis county school land, that the Jackson corner is substantially correct.

Appellant insists that if we reject agreed boundary, estoppel, and acquiescence, that the jury having rejected all other corners and lines, except the north Colony line and the southeast corner 312 varas east of survey 3039, that this court should render judgment in accordance with the jury's findings, by course and distance, constructing the surveys thereupon. Of course, ordinarily, we would think that the jury should have known that the court, in submitting the issues of the location of the northwest corner of Travis county and the east line of Colorado county, would not have withdrawn the evidence of appellees in support of their theory. At the expense though of being criticized for re-

marking the testimony, this court, in explanation of its ruling, in holding the charge as error, is impressed with the strength of the testimony, and its preponderance, pointing to the northwest corner of Travis, in accordance with Hudson's calls as to the round mound, in connection with the distance to Wagon Creek, as stated, and in further connection with Hudson's testimony, notwithstanding its indefiniteness. The "evidence, concerning the location of the east line of the Colorado tract, and of the northwest corner of the Travis county school land tract by D. W. Jackson in the year 1882, and concerning the location of said line and corner by Jackson, Howren, and Wallis in 1894," was very material to the location of the line and the corner in accordance with appellee's theory. If the jury obeyed the literal meaning of the instruction, it even withdrew practically all of Howren's testimony as to what the three surveyors did in 1894 (appellees' most important witness); and according to our view the preponderance of the testimony as to the location of the corner having been rejected by the jury, we presume error.

Justice Gaines, said in Baker v. Ashe, 80 Tex. 361:

"How are the jury to reconcile these contradictory charges? They are calculated at least to confuse; but perhaps the most serious objection to them is that they leave the jury free to follow either of the contradictory charges as their personal wishes or private feelings may dictate."

[7] Upshur and Travis counties, by cross-assignment of error, complain of the court's action in rejecting the field notes of certain junior surveys, and the senior field notes of the Peters Colony survey No. 2497, north of the Upshur and Colorado and in connection with which said counties offered the oral testimony of two surveyors as to certain lines run by them in 1913, which testimony was likewise excluded by the court. This testimony was offered for the purpose of showing "that the earlier surveyors operating in that vicinity and subsequent to the location of said school land surveys, recognized the north line of the Upshur county survey in Baylor county, and the north line of the Colorado county survey, to be where the defendant Upshur county claims the same to be as located from the said Jackson, Howren, and Wallis corner," and as "tending to show the true location of the north line of said school land surveys as located by Gen. Wm. Hudson, the original surveyor."

The Peters Colony No. 2497, according to the bill of exceptions, was surveyed October 19, 1853; the Ward survey, the Roome, the De Bon, the Marshall, the Kerns, the Smith, and the T. J. Bailey, were surveyed in October, 1855, by Daniel Montague, district surveyor of the Clay land district. The Ward survey is tied to the Peters Colony No. 2497, by a long call for distance, and is tied to the other surveys mentioned, either directly or inferentially, but it is noted that Mon-

tague, surveyor, does not call for either the Colorado or the north Upshur.

It is true that the Adams, Beatty & Moulton survey No. 1 ties to the north boundary line of the Upshur county school land, and Adams, Beatty & Moulton No. 2 ties to the north boundary line of the Colorado county survey, the former also calling for the Ward, the Marshall, and the Kerns surveys, and the latter, No. 2, calling for the Bailey in the Montague work; and the William Irish calls for the Ward and the Texas & New Orleans.

The testimony of the surveyors, offered in connection with the preceding field notes, indicates that they began a survey at the southwest corner of Peters Colony No. 2497, and ran to the Ward survey west 9,396 varas, and from thence through intervening surveys, principally course and distance, to the Adams, Beatty & Moulton survey No. 1, and assuming this point to be in the north line of the Upshur county survey, it was 36 varas south of the north line of said Upshur, locating the same by course and distance from the Jackson, Howren, and Wallis northwest corner of the Travis, exhibiting a conflict to that extent only. The statement in the bill as to the offered testimony of the surveyors, is that they were unable to find any bearing trees or any object on the ground, as called for in the field notes, by which they could locate any of the surveys north of the county school land tracts, except the southwest corner of No. 2497, Peters Colony survey, as called for in the field notes of the D. S. Ward. The field notes of all the surveys, in connection with the testimony of the surveyors, were offered as a whole. Without passing upon the admissibility of the Adams, Beatty & Moulton field notes, we are of opinion that the Montague work, as presented, is not admissible. The field notes of Montague do not call for the Upshur or Colorado, nor do they suggest that Montague knew anything about the location of the school land tracts. The Peters Colony No. 2497, is not shown to be connected with the Peters Colony on the south for which Wm. Hudson called in the county school land field notes. It may be that the Kerns, Bailey, and the William Smith are near the north line of the land in controversy, but the mere coincidence would not afford a reason justifying the admission of Montague's declarations which did not show that he knew where the Colorado and the Upshur were situated. As to these particular surveys, the presentation of the record is such as that the reason of the rule fails justifying the relevancy of a junior survey's work to point to the location of the work of a senior survey, when involved in doubt and uncertainty. We appreciate the force of the rule enunciated by Chief Justice Willie in the case of Linney v. Wood, 66 Tex. 30, 17 S. W. 244. He said:

"In reference to such matters as boundaries of lands surveyed long ago, the signs of which have been destroyed, and the location of which is not within the memory or knowledge of living men, many facts, tending to solve the question as to their true location, are permitted to go to the jury which the rules of evidence would exclude in other cases. Hence, the declarations of deceased persons are received. The evidence afforded by these grants is of a somewhat similar nature, and furnished a circumstance, though it may have been very slight, as to the received opinion in reference to the upper line of the Aldrete grant soon after it was issued."

The junior grants, suggested by Chief Justice Willie, as tending to show the knowledge of the surveyors of the north line of the Aldrete grant, we necessarily presume called for the latter survey, in some manner, either directly or indirectly.

[8] The brief of Upshur county attempts to strengthen this position by connecting the testimony of Howren as to the location of the Texas & New Orleans survey No. 1, from a post oak marked X, showing the same conflict of 36 varas between the Upshur county and the Texas & New Orleans, as suggested by the offered testimony of Denton, as between the Adams, Beatty & Moulton and the county's north line. We are not passing upon the admissibility of the Adams, Beatty & Moulton and the Texas & New Orleans field notes for the purpose for which Travis county and Upshur county offered all the testimony as presented in their bill of exception, but Denton having tied it all together, and the same having been offered as a whole, we are of opinion that the Montague work was not admissible.

[9] We are not prepared to say that the testimony is wholly insufficient to sustain the finding of the jury as to the southeast corner of the Travis county survey, 312 varas east of the northwest corner of Colony survey No. 3039. No marks or footsteps of the original surveyor, Hudson, having been found upon the south, necessarily the parallelogram survey of the counties will go to the north Colony line, though a part of the south line of the same is ascertained by protraction of the north line of the Colony. Maddox Bros. & Anderson v. Fenner, 79 Tex. 291, 15 S. W. 237. Of course if the footsteps of the surveyor were shown to the extent as to indicate that Hudson was off the Colony line, the case cited would not apply; also if the jury believed the theory of Travis and Upshur counties as to the round mound corner, and the call for Wagon Creek, in connection with the three-prong mesquite near their claimed northeast corner of the north Upshur, the opinion of Justice Henry in Maddox v. Fenner, supra, would not apply, and the southeast corner of Travis could not be placed where the jury placed it. "When unmarked lines of adjacent surveys are called for, and when from the other calls of such adjacent surveys the position of such unmarked lines can be ascertained with accuracy, and when in the absence of all evidence as to how the survey was actually made, there arises a controversy as to whether course and distance

or the unmarked line of another survey shall prevail, we see no good reason why the (adjoining) survey line should not be given the dignity of an 'artificial object' and prevail over course and distance." Same case, supra. We can see no good reason why, if Colorado county is tied to the round mound corner, as contended for by Upshur and Travis counties, its full complement of land does not exist. The record suggests that the country west and north of it, when Gen. Hudson made his survey, was vacant land. The Wagon Creek call and the three-prong mesquite, by course and distance, from the round mound corner, if we interpret the record correctly, would not subtract any land from Colorado county.

We are not wholly prepared to say that Travis and Upshur counties, undisputably established the round mound corner, aided by the Wagon Creek call, according to their theory, though impressed with the preponderance in their favor tending to prove it; and what we have heretofore said sufficiently disposes of the cross-assignment by Travis against Upshur county.

The record showing that all other parties in this suit contiguous to the county school land surveys, are holding under junior locations, this cause will be reversed and remanded as to all parties as a whole. We think it equitable that the three counties should be charged equally with the costs of this appeal, and it is so ordered.

### On Motion for Rehearing.

Appellee Upshur county, in its motion for rehearing, says:

"The court interprets the fact that the statute of limitations does not run against the county school lands, as indicating the intention to limit the powers of commissioners' court in dealing with its lands, and the general rules, applicable to individual owners, do not apply. The Constitution of 1876 expressly provides that 'no adverse possession or limitation shall ever be available against the title of any county.' The very fact that this and other provisions, limiting the authority of the commissioners, are expressly set out in the Constitution, would indicate that no other limitations were intended. This is a familiar canon of construction."

The above statement is probably referable to the following language used in our opinion:

"The repose of titles is the public policy underlying the statutes of limitations, and which the law reverses as to subdivisions of governments in certain instances. Delta County v. Blackburn, 100 Tex. 51, 93 S. W. 419; and which the Constitution was particular to reverse as to county school lands; for the courts to deny an undisturbed claim to land where the county is administering it solely as a trust where no agreement of boundary is proven, but at best mere acquiescence for a great length of time, is within the spirit of the same policy of reversal."

The courts substitute the very opposite policy with reference to limitation applied to subdivisions of government when the purpose is "to protect causes of action asserted by them when 'they are of a public nature and such as pertain purely to governmental affairs.'" Delta County v. Blackburn, supra. In that cause Delta county was suing to recover installments of interest due upon an obligation for its county school lands. The Supreme Court held that limitation did not apply, upon the ground that the county is an instrument of the state for educational purposes, and suits, brought by such a trustee, "are practically suits in behalf of the state," notwithstanding the title to the land, which the proceeds represent, is in the county. Where the county is administering the subject of the suit as a trustee, as in this cause, it is a suit in behalf of the state, as much so as in the Delta county case; of course, Justice Williams, when he used the language in the Delta county cause that a county, in suing for the trust school funds, was practically a suit in behalf of the state, did so in a qualified sense. Though the makers of the Constitution were particular enough to say that neither adverse possession nor limitation would avail against county school land, this was the law without the Constitution saying it; and the "familiar canon of construction" invoked that the mention of one limitation would be the exclusion of others, is precisely reversed, and so held in such matters. Same case; also Brown v. Sneed, 77 Tex. 475, 14 S. W. 248.

Appellees Upshur and Travis counties contend that this court has mistaken the full force and scope of the decision of the Supreme Court, in the case of Krause v. El Paso, 101 Tex. 212, 106 S. W. 121, 14 L. R. A. (N. S.) 582, 130 Am. St. Rep. 831. The Supreme Court did hold in that cause that the city of El Paso was estopped to claim a portion of a public street. The court of Civil Appeals opinion (Krause v. City of El Paso, 101 S. W. 828) and the opinion of the Supreme Court say that at the time Mrs. Porter, who built the brick building on the street, purchased the lot from Rector and Campbell, the previous owners, there was an ordinance of the city of El Paso, which requires persons who desired to erect improvements upon that property to have their lines designated by the city engineer; "and Mrs. Porter, being desirous to erect a house upon her property, called upon the city engineer to show her the lines of the streets surrounding her property. The city engineer, in accordance with her request, surveyed the lot and designated the lines and corner according to the first Mills map. Mrs. Porter built upon the property a brick house and went into possession of it, and the possession has been continuous since that time until this suit was brought." The city compelled her to build a sidewalk "along her property at the place where the controversy arose, which recognized her right as she claimed it, as it was shown upon the first Mills map, and in subsequent years she was at different times

required to repair the sidewalk." Mrs. Porter's request to the city engineer, the survey of the property by him for her, and the erection of a substantial brick building thereupon "shortly thereafter," were found as facts by the trial court. Mrs. Porter's application to the mayor for a permit to build the house, giving a description of the lot on which the house was to be erected, was prescribed by ordinance before the building could occur; another ordinance made it the duty of the civil engineer, upon request by the owner, to survey the lot for that purpose. Appellees are correct when they say that this application to build was not proven, but was presumed by the Supreme Court, as an affirmative fact, on account of the ordinance and the presumption of duty by the officers. Our statement is in accordance with the holding and the facts found and presumptively found, but a little broader than it should have been. The Supreme Court, on account of it being a violation of the law for the owner to build without a permit, assumed as an affirmative fact, in connection with the circumstances recited, that she made the application to the mayor for that purpose. The argument is that, because the Supreme Court assumed that the officers did their duty, and that Mrs. Porter did not violate the law and made the application, we should imply against Colorado county an agreement of boundary. This analogy we think is too remote as applied to this record.

Upshur county says:

"In the case of Talley v. Lamar County (Sup.) 137 S. W. 1135 (not heretofore cited in this cause), the doctrine of estoppel was invoked, but it was held that the facts were not proven, but the inference from the opinion of Judge Dibrell is clear, that if the facts had been proven, it would have been applied."

This case was cited several times by appellant, Colorado county, in its brief, and attempted to be tested by this court. The expressions of Justice Dibrell are really against the contention of appellee, but the facts are so remote and different as that we did not cite the case. Of course, "if the facts had been proven" in that cause, Lamar county would have abandoned its location of its school land; but, in order to abandon, it not only must have had an intention to abandon, but the state should grant it other land of an equal amount in place of that previously located; and as bearing upon this question this is all that the court held. Of course if the state had granted Lamar county other land, the previous grant was withdrawn, and the sovereign was agreeing to the abandonment and relinquishment.

We have gone to the testimony and reviewed part of the record and are not inclined to go further than what was said in our original opinion with reference to the corners. The motion for rehearing is in all things overruled.

---

⬚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes