LOPEZ et al. v. VELA et al.   (No. 5949.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 23, 1918. Rehearing Denied Feb. 20, 1918.)

1. BOUNDARIES ⟨⟩37(5)—ESTABLISHMENT BY ACQUIESCENCE—SUFFICIENCY OF EVIDENCE.

In an action of trespass to try title, the suit resolving itself into a contest as to the location of a boundary line, evidence *held* sufficient to establish the line against plaintiff's contention by acquiescence.

2. BOUNDARIES ⟨⟩48(2)—ACQUIESCENCE—ABSENCE OF DOUBT AS TO TRUE LOCATION.

Where there is no room to doubt the true location of a boundary, mere acquiescence in another line does not support a verdict in favor thereof.

3. BOUNDARIES ⟨⟩40(3) — ACQUIESCENCE — QUESTION OF FACT.

Acquiescence in a boundary is a question of fact for judge or jury.

4. BOUNDARIES ⟨⟩33 — ACQUIESCENCE—PRESUMPTION.

Acquiescence in a boundary affords a strong presumption that the line acquiesced in is the true line.

5. APPEAL AND ERROR ⟨⟩756—BRIEF NOT IN COMPLIANCE WITH RULES—CONSIDERATION.

Appellees' typewritten brief, consisting of 53 pages, in gross violation of the rules, will not be considered by the Court of Civil Appeals.

Appeal from District Court, Hidalgo County; V. W. Taylor, Judge.

Action by Francisco Lopez and others against Jesus Maria Vela and others. From a judgment for defendants, plaintiffs appeal. Judgment affirmed.

James B. Wells, F. W. Seabury, and Harbert Davenport, all of Brownsville, for appellants. Dawson & Anderson, G. R. Scott, and Boone & Pope, all of Corpus Christi, for appellees.

FLY, C. J. This is an action of trespass to try title to 2,000 acres of land out of a Spanish grant to Alejandro Farias, known as the San Jose tract, on January 24, 1809, and patented by the state of Texas on January 15, 1876. The suit was instituted by Francisco Lopez and 10 others against Jesus Maria Vela and 37 others. The suit resolved itself into a contest as to the location of a boundary line between the San Jose tract and the San Ramon tract, which was granted by the government of Spain to Julian Farias on January 24, 1809. The boundary line in dispute is the east line of the San Jose tract and the west line of the San Ramon tract.

The cause was tried without a jury, and resulted in a judgment for appellees.

The facts show that in 1804, the Spanish government granted 16 leagues of land to Julian, Alejandro, and Francisco Farias, three brothers, each receiving about four leagues of land, the grant to Julian Farias being called the San Ramon, the one to Alejandro Farias being named the San Jose grant, and the one to Francisco Farias being known as the Santa Cruz grant. Surveys of the three tracts were made by the same surveyor in the year 1808, in the same month. The three tracts were surveyed consecutively, beginning with the San Ramon taking a starting point on the west boundary line of a tract known as the Santanita, an older survey. The three tracts lay alongside each other, the Ramon on the east, the San Jose in the center, and the Santa Cruz on the west of the San Jose. The court found, and the evidence justifies the finding, that the tracts were laid off in rectangular shapes, the perpendicular lines running from north to south, the San Ramon grant being not so long, but some wider than the other two grants. There is evidence tending to show that, as originally surveyed, the land in controversy was mostly on the San Jose tract and not a part of the San Ramon grant.

In issuing the patents the true meridian lines laid out in the original Spanish grant were not followed, but for some reason not apparent the Santanita, an older survey, which was originally surveyed and granted on meridian lines which formed a pentagon, were changed by the patent to magnetic lines, and the shape changed to a rectangle. The San Ramon grant was also patented on magnetic lines, and not on the original meridian lines. These changes caused a conflict between the east line of the Ramon and west line of the Santanita tracts which caused a lawsuit. A map was made by Cocke and Hord which was used in evidence in this suit. That map showed that under the original surveys the northwest corner of the Ramon was a short distance west and north of the corner fixed by subsequent surveys on magnetic lines, and the west line of the Ramon tract on its way south cut into the west magnetic line, forming a small triangle in the northwest corner of the tract, which under the magnetic survey would be on the San Jose tract. After crossing the magnetic line aforesaid, the original meridian would pass further and further east of the west magnetic line of the San Ramon until it reached the original southeast corner of the San Ramon tract, forming with the west and south magnetic lines a large triangle containing the land in dispute. In the survey made by J. E. Eivet, the northwest corner of the Ramon tract was fixed at a point 480 varas due east of the east line of the San Jose, thence a little west of south until the east line of the San Jose tract is reached, thence with that

east line to its southeast corner, thence on the south line of the San Jose tract, 1,912 varas to a stake, thence a little west of south to the extreme southwest corner of the Ramon tract, thence to southeast corner, thence to northeast corner to beginning. The lines on the west of the Ramon were produced by a failure of the surveyor to run a straight line from the northeast to the southeast corner, which would have taken a triangle off the San Jose tract in its southeastern corner. The patent from the state followed the Eivet survey.

We adopt the findings of facts of the trial judge, as follows:

"First. In the year 1804, four leagues of land each were denounced by Julian, Alejandro, and Francisco Farias, brothers, which were known, respectively, as the San Ramon and San Jose and Santa Cruz grants, and surveys of said grants were made by the same surveyor, Antonio Margil Cano in the same month of the year 1808, consecutively, beginning with San Ramon, and starting from the west boundary of Santanita, which had been previously surveyed. The grants to these lands were made by the same Spanish governor, and title vested in the grantees to the respective grants in the year 1808, and by the act of the Legislature of the state of Texas of February 10, 1852, the lands so granted were confirmed, and the state of Texas relinquished to said original grantees, their heirs and assigns all the right of the state to said lands, as originally surveyed and granted, and each was subsequently patented by the state of Texas.

"Second. Plaintiffs deraign title by regular chain from and under the original grantee to the lands claimed by them respectively in the San Jose grant, and defendants deraign title by regular chain from and under the original grantee to the lands claimed by them respectively in the San Ramon grant.

"Third. The surveys of the San Ramon, San Jose, and Santa Cruz grants were made by the same surveyor, in the same month of the year, beginning with San Ramon, and then consecutively San Jose and Santa Cruz, in the order named, and all maps of the original grants show that said lands as originally surveyed and granted were surveyed between parallel lines in the form of rectangles, that they adjoined in the order named, and that no vacancies existed between them.

"The point marked 'XXI' on the Cocke & Hord map in evidence is the correct northwest corner of the San Ramon grant, as originally surveyed, and is on the east line of the San Jose grant, as originally surveyed. The southeast corner of the San Jose grant as originally surveyed is the point designated 'Y,' on said Cocke & Hord map, and this corner is on the west line of the San Ramon, as originally surveyed.

"Fourth. The point 'H' on the Cocke & Hord map, in evidence, being the point located and identified by a stone about 6,380 varas N. 81 deg. W. from the stone called 'Rosario' marked 'U,' on the Cocke & Hord map, and 388 varas N. 9 deg. E. from the point marked 'F' on the Cocke & Hord map and a mesquite with a stone at the foot thereof marked 'E' on said Cocke & Hord map, just west of the San Ramon ranch and on the west side of a depression in which the old San Ramon ranch and wells are situated, has for more than 30 years been recognized, regarded, and accepted by the owners of the land in the San Ramon and San Jose grants as the northwest corner of the San Ramon, and other well known and accepted corners and boundaries of the San Ramon grant are identified on the Cocke & Hord map by the following letters and figures: 'F,' 'E,' 'S,' 'L,' 'M,' 'XIII,' 'B,' 'G,' and 'I.'

"Fifth. The aforesaid corner designated 'H' on said Cocke & Hord map and the line running therefrom S. 9 deg. W. through the point 'F' and the point 'E' (stone at foot of mesquite tree), 'X,' 'S,' 'W,' and to the point 'L,' are recognized and well established and identified locations, and such line so running has been recognized, accepted, and acquiesced in by the owners of the San Jose and San Ramon grants, including plaintiffs and defendants, and those under whom they respectively claim, as the common and true boundary line between said grants of land for many years longer than necessary for any period of limitation, to wit, for more than 30 years.

"Sixth. The old San Ramon Ranch, which is located east of the point 'E' on said Cocke & Hord map, and referred to in the fourth paragraph hereof, is on the San Ramon lands, and this ranch site has existed at its present location since about the year 1804, and has been occupied by successive owners under the original grantee of the San Ramon ranch for more than 50 years, claiming it as a part of the San Ramon grant.

"Seventh. For a longer period of time than necessary to prescribe under any period of limitation, the defendants, and those under whom they claim, have been in possession, use, and occupancy of the lands claimed by them herein, and asserting title thereto as part of the San Ramon grant, and their respective claims during all these years have not been disturbed by adverse claims until the institution of this suit, on the 26th day of March, A. D. 1910.

"Eighth. The defendants, and those under whom they claim, have for many years rendered and paid taxes on the lands respectively claimed by them, some of said defendants paying taxes for consecutive years and others for consecutive years with one or two omissions. The renditions so made gave the abstract number and the name of the original grantee.

"Ninth. Defendant Vela fenced a part of the land owned by him in the San Ramon grant, and being a part of the land in controversy herein, in 1895, and completed his fencing and inclosure of all the lands claimed by him in the San Ramon grant in 1896, except as to a small portion in the northeast corner, which was held jointly fenced with cotenants until 1905, when he changed his fences so as to include same in his inclosure, and some of the defendants who own land in both the San Jose and San Ramon grants have had their holdings in the two grants inclosed under fence since about the year 1898, and these fences inclosing these holdings extend over the recognized boundary between the two grants, and the others built fences inclosing their lands, within the tract of land in controversy, some time in 1898, and all said parties have continuously maintained their fences and have been in possession, use, and occupancy of said lands since said respective dates.

"Tenth. Some of the plaintiffs joined fences with the fences on this boundary line, and none of the plaintiffs, or those under whom they claim, raised any objection to said fences, or claimed any of the lands within said fences until the institution of this suit, but all recognized, accepted, and acquiesced in the line above described as the boundary line between said San Ramon and San Jose tracts or grants of land.

"Eleventh. The defendants Vela and others building said fences so built said fences in reliance upon the line claimed by them being the boundary line between the San Jose and San Ramon grants."

[1] The evidence shows without contradiction that the boundary line fixed by the court had been recognized as the boundary line between the San Ramon and San Jose tracts

for many years. The whole line had been fenced for a long time. In 1898, a fence extended along the boundary line a larger part of its length. The ranch houses were west of the meridian line contended for by appellants, and had been there for 50 years or more. There is sufficient evidence to show that the magnetic boundary line contended for by appellees was recognized and acquiesced in by those owning the San Jose tract. When Lund surveyed the grant and fixed the line between the San Jose and San Ramon grants from objects he found on the line, that survey was made to be used in a contest as to the boundary line between the San Jose and Santa Cruz grants. The case in which it was used was Barrera v. Guerra, 122 S. W. 902, which was decided on appeal by this court. The survey was made at the instance of appellants, and was used by them in the case cited to establish the magnetic lines as their true boundaries. The fence was on the boundary line between the San Ramon and San Jose grants, and Lund said that the plaintiffs in that suit, who own the San Jose tract, told him that the fence was the west line of the San Ramon. They desired to extend their land on the west side of the grant, and it was only after they had failed in that effort that they then turned to their line on the east, and sought to gain land on that side. The owners of the San Jose tract pointed out the corners of the San Ramon to Lund, and those are the corners contended for by appellees. The survey by Lund was made from the starting point and on the lines pointed out by the owners, who were then seeking to win the case involving the west line of the San Jose tract. Portions of the San Ramon grant were bought by different parties with reference to the fence on the old boundary line. The evidence was sufficient to establish the boundary line by acquiescence, and appellants are estopped to deny that the line is the true boundary. Brackenridge v. Howth, 64 Tex. 199. In the case of Floyd v. Rice, 28 Tex. 341, it was held:

"This is not a suit for land; the question in the case is one of boundary. There is no conflict of title. Each of the parties acknowledges the title of the other to the land designated in his deed. The contest is waged for the purpose of ascertaining and establishing the common boundary recognized by both titles. On this question of the locality of the boundary, the acquiescence of the parties in or their recognition of a particular line is evidence which should have great weight in determining their boundary, affording, as it does, a strong presumption that the line so recognized is the correct line, which presumption is strengthened by the lapse of time."

Of course there is no time fixed by law that would raise a conclusive presumption of the correctness of a line, but each case must furnish its own rule, to be deduced from all the circumstances. All the circumstances arising through many years tend to show acquiescence in the line. This acquiescence was carried to the extent of joining fences with those living on the San Ramon grant. The case of Rice v. Floyd has been followed in a number of cases. Medlin v. Wilkins, 60 Tex. 409; Lagow v. Glover, 77 Tex. 448, 14 S. W. 141; Bohny v. Petty, 81 Tex. 524, 17 S. W. 80; Colorado County v. Travis County, 176 S. W. 845.

[2-4] It may be that, where there is no room to doubt the true location of a boundary, mere acquiescence in another line would not support a verdict in favor thereof. Bundick v. Moore-Cortes Canal Co., 177 S. W. 1030. In this case, however, there has been and is grave doubt as to the true location of the common boundary line between the San Jose and San Ramon tracts, so much so that several lawsuits have entertained the question as to the true boundaries. Acquiescence is a question of fact for judge or jury, as the case may be, and such acquiescence affords a strong presumption that the line acquiesced in is the true line. Beebe v. Sweeney, 158 S. W. 235; Koenigheim v. Sherwood, 79 Tex. 508, 16 S. W. 23. We think the facts were sufficient to show acquiescence in the line claimed by appellees.

[5] No brief was filed in this case by appellees until after the cause was submitted, and then only one brief was filed, which consisted of 53 pages of typewritten matter. Being in gross violation of the rules, it has not been considered, and the printed briefs presented some days later were not permitted by the court to be filed. We have deemed it necessary to call attention to this matter, although the cause has been decided favorably to appellees, in order that a precedent may not be established that would destroy the rules as to briefs.

The judgment is affirmed.