# SUPREME COURT OF TEXAS.

## TYLER TERM, 1877.

### J. D. WORLEY v. THE STATE.

1. SCHOOL LANDS—CONSTITUTIONAL LAW.—Section 8 of article 6 of the Constitution of 1869, ("The public lands heretofore given to counties shall be under the control of the Legislature, and may be sold under such regulations as the Legislature may prescribe; and in such case the proceeds of the same shall be added to the public-school fund,") without legislative action, did not divest the counties of the title to school lands which had been granted to them.

2. SAME.—In a suit brought in the name of the State, by the district attorney, against parties holding school lands under lease from the county holding patents therefor, it was error to instruct the jury, "that the school lands were a part of the general school fund, and that the State was entitled to recover, if the lands sued for were county school lands."

3. DISCUSSED AND LIMITED.—Galveston County v. Tankersley, 39 Tex., 656, discussed and limited.

ERROR from Anderson. Tried below before the Hon. M. H. Bonner.

The facts are given in the opinion.

*Word & Word*, for plaintiffs in error.—This was a suit brought by the State to recover certain lands which had been given, and for which patent had issued by the State, to Anderson county, mentioned in plaintiffs' petition; and for damages for timber charged to have been destroyed by defendants. The County Court of Anderson county, for the county, pleaded that the lands in controversy had been conveyed by the State to the county for school purposes, and that the County Court, acting for the county, in right of the patent to

the county, had leased the lands, to raise money to support schools, &c. The defendants, Worley and others, pleaded their lease from the county, and that they had taken possession of the land under the contract of lease, and had not transcended the power and authority conferred upon them by the lease aforesaid. The errors assigned are—

1. That the court erred in overruling the exceptions to the petition.

2. That the court erred in charging the jury, that the land contained in the patent of the State to the school commissioners of the schools for Anderson county did not vest the lands in the county commissioners, but that the land belonged to the general school fund, and that the State was the proper owner thereof, and entitled to recover the lands in controversy. If this charge is correct, the merits of the case are with the appellee. By the Constitution and laws of the State, prior to the adoption of the present Constitution of 1869, lands had been given to many, if not all, the counties. In many instances, where the public lands had been taken up in a county, the county so entitled to land, and having no public lands within its limits, located its lands in other counties, and in some cases at a considerable distance; and the lands so donated to the counties were surveyed and patented to the counties. And the question arises, and is the question of this case,—Can the State, in convention, or by legislative enactment, assume the control and disposition of lands so donated, surveyed, and patented to the counties? In other words, can the State, in any manner, or by any means, take back the land it had given away, and by solemn patent designated and severed from the public domain? In this case, a patent had issued, on the 10th day of September, 1852, to the school commissioners of Anderson county, for the land in controversy. The only restriction in the Constitution of 1845, (art. 10, sec. 3,) was, that the lands should not be alienated in fee, nor disposed of, otherwise than by lease for a term not exceeding twenty years.

By the act of 1840, (Paschal's Dig., art. 3473,) the chief justice and two associate justices were made school commissioners; and power was conferred on them to dispose of the school lands, by lease or absolute sale. The land in controversy in this case had been leased by the County Court, as school commissioners, to the defendants, Worley, Ezell, and Posey, for a certain number of years, and the suit was brought by the State to recover the land absolutely, and damages for the trespass in cutting timber. Can the State recover? Could the Constitution of 1869 revoke the titles previously passed to the counties by patent, and take the land back, and annul all contracts made by the counties for leasing these lands? The fourth section of the ninth article of the Constitution attempts to do this, and to place all the lands granted to the counties under the control of the State, and to carry these lands into the general school fund. We submit, that this cannot be done; that when the State issued an absolute patent for the land, it had no further authority over it. This was virtually decided by the Supreme Court, September, 1873, at Austin, in the case of The County of Galveston v. Tankersley, 39 Tex., 656. A gift of chattels perfected by delivery, and of realty by a solemn deed made and delivered, cannot be revoked at the pleasure of the donor. (2 Kent's Comm., Lec. 38, page 438, as to Chattels, and 2 Blackstone's Comm., page 317; and that a county can take by gift or devise, see The County of Bell v. Alexander, 22 Tex., 350.)

By the Constitution of the Republic of Texas, (Hartley's Dig., page 37, fifth section of general provisions,) the only provision made is, that it shall be the duty of Congress, as soon as circumstances will permit, to "provide by law a general system of education." Thus the whole matter was left to the Congress. So, too, with Constitution of the State of Texas; (Hartley's Dig., pages 77, 78, sec. 1, art. 10;) and by the third section of the same article, (page 78,) a restriction on the sale of school lands is made. But by the act of 26th January, 1839, the counties each had three leagues of

land granted them; and the only restriction was, that they should not sell before the expiration of three years, but may lease the same during the three years. In Hartley's Dig., page 292, sec. 6, and by the act of 5th February, 1840, the chief justice and two associate justices were made county commissioners, and might "hold, lease, sell, and convey, or otherwise dispose of all the school lands in their county." No constitutional restriction was laid on these county commissioners. (Hartley's Dig., page 292, sec. 1.)

By the act of 16th January, 1850, (Hartley's Dig., page 294, sec. 1,) an additional league is given to the respective counties, making four leagues; and no restriction is placed on the sale, &c. But by the Constitution of the State, above referred to, (art. 10, sec. 3,) a sale is supposed to be prohibited, but no restriction is placed on the commissioners to lease for any term not to exceed twenty years; and the lease in this case under consideration is only for the term of three years. It is, therefore, confidently submitted, that the plaintiffs could not sustain this action.

*George Clark, Attorney General,* for the State.

I. Under our system of government, counties are public corporations, and simply parts of the machinery employed in carrying on the affairs of the State. They are subject to be changed, modified, or destroyed, as the exigencies of the public may demand. The State can always exercise a general superintendence and control over them and their rights and effects, so that their property is not divested from the uses or objects for which it was given or purchased. (Trustees of Schools *v.* Tatman, 13 Ill., 30; Harrison *v.* Bridgeton, 16 Mass., 16; Montpelier *v.* East Montpelier, 27 Vt., 704; Id., 29 Vt., 19; Benson *v.* The Mayor, &c., 10 Barb., 233; Cooley's Const. Lim., page 239, note.)

Says the Supreme Court in Missouri: "The county is not a private corporation, but an agency of the State government; and though, as a public corporation, it holds property,

such holding is subject, to a large extent, to the will of the Legislature." (The State *v.* St. Louis County, 34 Mo., 572; Cooley's Const. Lim., pages 235–239.)

The true rule, deducible from the weight of authority, and founded more upon good faith and common justice than strict law, seems to be, that where a State has once granted a donation to a county for public purposes, it can still exercise authority and control over the disposition and use of such donation, according to the legislative view of what is proper for the public interest, subject, perhaps, to the restriction, that the purpose for which the property was originally donated should be kept in view, so far as the circumstances will admit, in any appropriation that may be made of it. (Cooley's Const. Lim., pages 237, 238, and authorities cited.)

Applying these principles to the case at bar, we find that the Congress of the Republic, on January 26, 1839, passed an act providing that each county of the Republic should have surveyed and set apart three leagues of land, for the purpose of establishing a primary school or academy in said county, (Paschal's Dig., art. 3464, *et seq.*,) which was supplemented, on January 16, 1850, by an act of the Legislature providing for a like survey and setting apart of four leagues, by counties organized since February 16, 1846. (Paschal's Dig., arts. 3468, 3469.)

It may be well to call attention here to the phraseology of these two statutes. The Republic and State do not grant *in haec verba* these lands to counties. The language is, "shall have surveyed and set apart"; that is, separated and segregated from the public domain. If issuing of patents to counties was ever authorized, I have been unable to find such statutory authority, after careful search, except in the cases of Robertson and Navarro counties, (Paschal's Dig., arts. 3471, 3472,) although patents have issued.

The captions of the two acts above recited, cut no unimportant figure in reaching a correct conclusion as to the real character of the legislation. In the first, we find it is "An

act appropriating certain lands for the establishment of a general system of education." In the second, it is "An act making additional appropriation of lands for the purposes of education."

The purpose and object of both seem to have been the establishment of a general system of education throughout the limits of the State, and to use the counties simply as machinery for the general diffusion of the State's beneficence. The legislation was not a donation outright to counties, for the purpose of leaving its use and disposition in the discretion of each county; but it was the initiatory step in a general system, inaugurated by general laws, and designed for the benefit of the whole State.

These acts stood in force until the adoption of our present Constitution. That instrument contains the following provision:

"The public lands heretofore given to counties shall be under the control of the Legislature, and may be sold under such regulations as the Legislature may prescribe; and in such case the proceeds of the same shall be added to the public-school fund." (Const. of 1869, art. 4, sec. 8.)

If the previous views herein expressed, as to the character of this appropriation and setting apart of lands to counties, be correct, no question can ever arise as to the entire consonance of this clause with the Federal Constitution, under the familiar decisions of the United States Supreme Court. If the State never made a grant of these lands to counties, never legally parted with its title to the same, but only intended that said lands should be set apart and designated for a specific purpose, the validity of the State's resumption can admit of no question, more especially in view of the fact that such resumption was effected by the whole people themselves, by their highest governmental act, speaking through their organic law.

But taking a broader view of the question, and admitting, for the purposes of the argument, that the two acts in question

were legislative grants, and that since their enactment titles to counties have been perfected by issuance of patent, is the constitutional provision above quoted even then invalid? The principle is well established with us in Texas, that "If a legislative grant is not made in discharge of some obligation of the government which the law recognizes, it cannot be deemed, in a legal sense, anything but an act of sovereign grace and bounty on the part of the political authority, it matters not how meritorious the considerations are upon which such donation is made." (*Causici v.* La Coste, 20 Tex., 286.) In other words, such grant does not carry with it the essentials of a contract; nor would its revocation, in cases where the donee was simply a part of the machinery of government, be an impairment of any obligation—certainly any legal obligation. A grant of prize-money is revocable before distribution; (Lewin on Trusts, page 101;) and, under the authorities quoted, the revocation, if revocation it be, is valid, because the fund is not diverted from the original purpose, until the establishment of a general system of education.

But there has been no such revocation. If the title in these lands ever was in the counties, it is there still. The clause in the Constitution does not divest such titles. It prescribes that "such lands shall be under the control of the Legislature, and may be sold under such regulations as the Legislature may prescribe." The Legislature has never seen fit to provide for their sale, in any manner. This legislative control is the operation of no new right. It always existed. How, then, can the clause in question conflict with the Federal Constitution? Objection to the last clause, "and in such case the proceeds of the same shall be added to the public-school fund," cannot be urged or heard, in this case, at least. Before a judicial inquiry can arise as to this last clause, the lands must be sold, or in process of sale, and the proceeds about to be paid into the general school fund. Who could then stand as a particular champion of the counties' interest as against the State of Texas, it is not necessary now to

inquire. In the meanwhile, these lands being under State control, it is not only the right, but the duty, of the State to protect them from waste or damage; and the action was properly brought in her name and by her officers.

II. If these lands were actually granted to school commissioners of counties, it was a donation in trust for certain purposes; and the trustees having ceased to have legal existence, the property necessarily reverted to the grantor, to be administered and applied to the general purposes of the original trust. (Hill on Trustees, pages 130–134; 4 Dana, 359.)

The court will bear in mind, that the patent in this case was not issued to Anderson county, but to the school commissioners of said county. There can be no pretense that Anderson county was ever, as a corporation, invested with title, or had any interest in these lands, even as *cestui que trust.* The people of Anderson county were the beneficiaries, and the record discloses no complaint upon their part. These commissioners ceased to have existence long anterior to the act of leasing, set up by way of defense in defendants' answers. The lands in question, set apart for a beneficent purpose, were being wasted, and their value totally destroyed, by the acts of these defendants, and there was no authority, other than the State, competent to intervene for their protection. The State, through its law officers, assumed this duty, and properly.

These parties defendant, Worley *et al.,* were mere trespassers. No authority was given, even by the act of 1866, to Police Courts, to lease lands of this character. (See Paschal's Dig., 6626, *et seq.*) This act itself became inoperative upon the adoption of the Constitution, because since then no such authority as "Police Courts" has been known to the laws. The present "County Courts" succeeded only to such rights and powers as were expressly conferred by statute, and, practically, there have never been any regulations prescribed by the Legislature for the disposition of these lands, either by sale or lease. Even the very law under which the County Court of Anderson county presumed to act, as a board of

school directors, (not commissioners,) necessarily forbade the act in question, and manifested a full claim of ownership on the part of the State to these lands. (See Paschal's Dig., art. 6666.) All parties were presumed to know the Constitution and general statutes of their own State, and the plea of ignorance was frivolous.

The court did not err in its rulings or charge, and the verdict and judgment are in accordance with the law and the evidence.

Attention is also called to the fact that the Legislature of 1866 recognized these lands as really belonging to the State, and provided that, upon sale, the proceeds should be paid into the State treasury, and constitute a part of the perpetual (general) school fund. (See Paschal's Dig., 2d vol., art. 6633; see, also, Const. 1866, art. 10, sec. 6; 1 Paschal's Dig., page 945.)

GOULD, ASSOCIATE JUSTICE.—On the 1st of February, 1871, the County Court of Anderson county leased to defendant Worley, for the term of three years, 3,307 acres of school land, being the same patented to the school commissioners of Anderson county on September 10, 1852. This suit was brought in the name of the State, on December 5, 1872, to recover of defendants, Worley and others, the lands so leased. The substantial question involved in the case is,—Has the title to the school lands granted to counties been divested out of the counties, and revested in the State? In the case of Galveston County *v.* Tankersley, (39 Tex., 656,) this question was decided in the negative. The court held, that it was not the purpose of the Constitution to annul these grants to the counties, and that the counties still held the lands in their own right. As an original question, it may be admitted that the true construction of sections 6 and 8 of article 9 of the Constitution is involved in doubt. Our examination, however, has tended to the same conclusion arrived at by the court in the case of Galveston County *v.* Tankersley, as to the proper construction

of these sections, and has certainly developed no sufficient reason for denying the authority of that case on that point.

A brief statement of some of the reasons in favor of this construction is deemed appropriate.

So much of section 6 of article 9 of the Constitution as is material for our purpose, reads as follows: "As a basis for the establishment and endowment of said public free schools, all the funds, lands, and other property heretofore set apart and appropriated, or that may hereafter be set apart and appropriated, for the support and maintenance of public schools, shall constitute the public-school fund." * * *

Section 8: "The public lands heretofore given to counties shall be under the control of the Legislature, and may be sold under such regulations as the Legislature may prescribe; and in such case the proceeds of the same shall be added to the public-school fund."

In section 6, the county school lands are not designated in terms. There were other lands which had been "set apart and appropriated for the support of public schools" in the State at large, to which the clause is plainly applicable. In regard to some of the lands granted to counties "for the purpose of establishing a primary school or academy" therein, it may be said to be a matter of public history, that in some cases they had been sold before the adoption of the Constitution of 1845 prohibiting their sale, and the proceeds had been applied to the erection of academics. The better construction seems to be, that the county school lands were not intended to be embraced in the lands which are made to "constitute the public-school fund." If, in fact, these lands were, by section 6, made a part of the school fund in any such sense as to make them no longer the property of the counties, but the property of the State, then the eighth section, subjecting these same lands to the control of the Legislature, seems unnecessary. In that section, the school lands given to counties are specifically named. But though the Legislature are empowered to have these lands sold, and the proceeds of the

sales are to be added to the public-school fund, it does not follow, of necessity, that, before sale, the counties were divested of title; nor that, after sale, they were to be deprived of the benefit of the interest of the proceeds.

Some light is obtained, by comparing the sections under consideration with the corresponding parts of the Constitution of 1866, from which they appear to have been taken.

Parts of that instrument are as follow:

Section 2: " The Legislature shall, as early as practicable, establish a system of free schools throughout the State; and as a basis for the endowment and support of said system, all the funds, lands, and other property heretofore set apart and appropriated, or that may hereafter be set apart and appropriated, for the support and maintenance of public schools, shall constitute the public-school fund," &c.

Sections 3 and 4 set apart the alternate sections of land reserved by the State out of grants to railroad and other corporations as part of the perpetual school fund, and required the Legislature to provide for their sale.

Section 6: " All public lands which have been heretofore, or may be hereafter, granted for public schools to the various counties or other political divisions in this State, shall be under the control of the Legislature, and may be sold on such terms and under such regulations as the Legislature shall by law prescribe; and the proceeds of said lands shall be added to the perpetual school fund of the State.    But each county shall receive the full benefit of the interest arising from the proceeds of the sale of the lands granted to them respectively: *Provided*, That the lands already patented to the counties shall not be sold without the consent of the county or counties to which the lands may belong."

It is beyond controversy, that the intention of the framers of the Constitution of 1866, as made plain by the latter clauses of section 6, just copied, was not to divest the title out of the counties, nor to deprive them of the benefit of the proceeds of the lands for the use of public schools within their limits,

The omission of these clauses in the present Constitution may show an intention to give the Legislature more unlimited authority to sell, and perhaps an intention to leave it to that body, in their discretion, to make the interest on the proceeds go to the benefit of the schools of the State at large, or to the benefit of schools of the respective counties to which the lands belonged. But it cannot be said, that from the omission of these clauses, or from anything in section 8 as it now stands, does it plainly follow that the counties are, without legislative action, divested of their title.

There has been no legislation, under the Constitution, on the subject, except the act of August 13, 1870, which attempted to make the county school lands a part of the permanent school fund, but which was repealed before the trial of this cause. (Paschal's Dig., art. 6666; Laws of 1873, page 94.) It is not necessary, therefore, to consider its effect.

The charge of the court below was to the effect that the school lands of Anderson county were a part of the general school fund, and that the State was entitled to recover if the lands sued for were county school lands. Various irregularities appear in the institution and progress of the suit; but it is believed necessary only to dispose of the main question.

It is proper to remark, that whilst we recognize the authority of the case of Galveston County *v.* Tankersley, on the question actually decided, to wit, the construction of the Constitution, we are by no means prepared to assent to what is said in the opinion in that case, denying the power of the State over lands granted by her to her own political subdivisions for public purposes.

The judgment is reversed and the cause remanded.

REVERSED.

NOTE.—This case was submitted October 22, 1874, and at close of the Tyler Term taken under advisement and transferred to Galveston Term, It was decided February 16, 1875. The case is of importance, and is now inserted, though out of its order.