WASHINGTON COUNTY v. PENDLETON
et al.　(No. 5456.)

(Court of Civil Appeals of Texas.　Austin.
May 12, 1915.)

1. WATERS AND WATER COURSES ⬤⟿242—IR-
RIGATION—CONSTRUCTION OF DITCHES—CON-
STITUTIONAL AND STATUTORY PROVISIONS—
"ALL SCHOOL LANDS."

Const. 1869, art. 9, § 8, provides that the
public lands, heretofore given to counties, shall
be under the control of the Legislature and may
be sold under such regulations as it may pre-
scribe, in which case the proceeds shall be added
to the public school fund.　The act concerning
private corporations, approved April 23, 1874
(Acts 14th Leg. c. 97), granted the right to irri-
gation companies to construct canals across and
along any stream of water, but did not, in
terms, grant a right of way over the public
lands, and act approved March 10, 1875 (Acts
2d Sess. 14th Leg. c. 63), granted to irrigation
corporations a right of way over all public and
school lands, and authorized them to obtain the
right of way over private land by contract or
under general laws, and granted to companies
complying therewith a certain number of sec-
tions per mile according to the class of the
ditch.　Held that, where an irrigation ditch was
constructed while the Constitution was in force,
and the reports of the official inspector showed
compliance with the act of 1875, and the state
thereunder issued certificates of sections to the
irrigation company, the company and its suc-
cessors had the right to construct and to main-
tain the ditch; the term "all school lands" in-
cluding county as well as state school lands.

[Ed. Note.—For other cases, see Waters and
Water Courses, Cent. Dig. §§ 147, 307; Dec.
Dig. ⬤⟿242.]

2. WATERS AND WATER COURSES ⬤⟿216—IR-
RIGATION—COUNTY SCHOOL LANDS—VALID-
ITY OF STATUTE.

Under Const. 1869, art. 9, § 8, providing
that public lands heretofore given to counties
shall be under the control of the Legislature and
may be sold under its regulations, in which case
the proceeds shall go to the public school funds,
Act March 10, 1875, conferring a right of way
for irrigation ditches across county school lands
patented to the county in 1852, was valid, since
such act did not impair the county's title but
granted only an easement.

[Ed. Note.—For other cases, see Waters and
Water Courses, Cent. Dig. § 305; Dec. Dig. ⬤⟿
216.]

Appeal from District Court, Tom Green
County; J. W. Timmins, Judge.

Suit for injunction by Washington County
again W. F. Pendleton and others.　Judg-
ment for defendants, and plaintiff appeals.
Affirmed.

Washington county instituted this suit
against W. F. Pendleton and others, seeking
to restrain the defendants from maintaining
and using a certain dam adjacent to, and a
certain irrigation ditch over and across, sur-
vey No. 105, section 14 of Washington coun-
ty's school lands, located in Tom Green coun-
ty.　Without going into particulars concern-
ing the pleadings, it is sufficient to say that
they presented the questions of fact decided
by the trial court and the questions of law
presented in this court.　There was a non-
jury trial, which resulted in a judgment for
the defendants, and the plaintiff, Washing-
ton county, has appealed.　The trial court
made the following findings of fact:

"(1) Plaintiff, Washington county, is a coun-
ty municipal subdivision of Texas and has been
duly organized as such since 1837, and that
this suit was filed and is being prosecuted under
proper orders of its commissioners' court.

"(2) That the land described in plaintiff's
petition was granted to plaintiff under the act
of the Republic of Texas approved February 5,
1842, as one of its four leagues of county school
land, and the same was duly patented by the
state to Washington county, by patent issued
February 14, 1852.

"(3) That said survey 105 described in plain-
tiff's petition is situated on the east bank of
the South Concho river in Tom Green county,
and survey 106, also one of the four leagues be-
longing to plaintiff, is situated on the west bank
of said river opposite said survey 105.

"(4) That the said South Concho river is a
natural water course, and as such a stream re-
tains an average width of more than 30 feet, and
the lines of the surveys located thereon do not
cross the same.

"(5) That the Bismark farm is situated in
Tom Green county on surveys 643, 172, 171,
170, and 169 on the east bank of the South and
Main Concho rivers below plaintiff's said land
and irrigable by gravity from the waters of the
South Concho river.

"(6) That in the year 1874, and for a num-
ber of years thereafter, F. C. Taylor was the
owner of and in possession, use, and occupancy
of said Bismark farm, and in said year, for the
purpose of diverting the waters of said South
Concho river and conveying the same to and
irrigating the said Bismark farm, he located the
dam and ditch in question on and across plain-
tiff's said survey No. 105, and during the fall
of 1874 begun the building and construction of
said dam and ditch, and thereafter, in the year
1875, enlarged and extended the same, and the
said dam and ditch have from said year 1874
to the present time been without interruption or
interference from Washington county or any
other source whatever continuously and openly
used under claim of right by said Taylor and
each of the successive owners of the said Bis-
mark farm in the diversion and conveyance of
the waters of the South Concho river to and ir-
rigating the lands in said Bismark farm.

"(7) That after the location and partial con-
struction of said dam and ditch as aforesaid, by
said F. C. Taylor, he, with associates, by char-
ter filed April 12, 1875, incorporated the Ben-
ficklin Irrigating & Manufacturing Company
under the act of March 10, 1875, entitled 'An
act to encourage the construction of canals and
ditches for navigation and irrigation' for a term
of 100 years, and thereafter said dam and ditch
were further constructed, enlarged, and extend-
ed, and under reports made by Henry C. King,
inspector of ditches west of the Colorado river,
to and approved by Gov. Coke and Gov. Hub-
bard, dated respectively May 22, 1872, and
April 24, 1877, 31 certificates for 640 acres each
were issued by the commissioner of the land of-
fice to said company for the construction of said
dam and ditch, and which said certificates were
located upon the public domain of Texas and the
patents duly issued therefor.

"(8) That on the 30th day of September, 1893,
the owner of said Bismark farm, in obedience to
the requirements of the act of the Twenty-Third
Legislature approved March 29, 1893, amenda-
tory of the act approved March 29, 1889, caused
to be filed and recorded in the irrigation ditch
records of Tom Green county a sworn survey,
measurement, and statement of said dam and
ditch, with a map showing the location thereof,
and the Bismark farm irrigated therefrom, and
that said dam and ditch since said filing and

record in September, 1893, have been continuously and openly under claim of right and without interruption exclusively used by the owners of said farm for the purpose of irrigating the same.

"(9) That the value of said farm since the construction of said dam and ditch has been based upon and determined as an irrigated farm with the use of the waters flowing from said dam and through said ditch on plaintiff's land, the land irrigable therefrom being sold and purchased for a higher price than that not irrigable therefrom.

"(10) That defendants W. F. and C. H. Pendleton purchased 1073.53 acres of said farm, paying for the 300 acres irrigable from said dam and ditch at the rate of $100 per acre, and $12.50 per acre for the part of said land not so irrigable from said dam and ditch, and the defendants S. M. King, P. L. Tippet, and the First National Bank of Wichita Falls purchased 402¾ acres of said land on the basis of the same being irrigable from and by said dam and ditch, paying therefor $80 per acre.

"(11) That at the date of the defendants' respective purchases said lands had been irrigated by said dam and ditch for more than 25 years without any objection, interruption, or interference from Washington county or others, and no question was ever raised by plaintiff as to the right of defendants and those under whom they hold title to maintain said dam and ditch on said survey 105 until just immediately before the filing of this suit.

"(12) That search of the minutes of the county court of Washington county for the year 1874 and the years 1875 and 1876 prior to the organization of the commissioners' court under the Constitution of 1876, and all the minutes of said court from 1876 to the present time, and also all papers and files of said county court and commissioners' court to the present time (there being no papers or files of said courts prior to 1876), fail to show any express order, contract, or agreement from Washington county to F. C. Taylor or the Benficklin Irrigating & Manufacturing Company or any one claiming under said company or said Bismark farm, granting the right to construct said dam and ditch on and across said survey No. 105.

"(13) That the minutes of said county and commissioners' court are not indexed, and part of the minutes of the county trial court from pages 310 to 315 appear to have been cut out of the minute book; the last judgment therein being the 6th day of April, 1870, and the next thereafter being the 17th day of July, 1876.

"(14) That prior to the organization of Tom Green county, in 1875, it was attached to Bexar county for recording and judicial purposes, and a search of the county court minutes and papers of Bexar county for the year 1874 and the year 1875, and of Tom Green county after its organization, fails to show any condemnation suit or proceedings against Washington county by said Taylor, or said Benficklin Irrigating & Manufacturing Company or the Bismark farm, or any person claiming under them, to acquire by condemnation the right, privilege, or easement for the construction of said dam and ditch on said survey 105.

"(15) That search of the deed records of Tom Green county and the transcribed deed records thereof from Bexar county fail to show any judgment in condemnation or orders, contracts, or conveyances from Washington county to said Taylor or the Benficklin Irrigating & Manufacturing Company, or the Bismark farm, or any one connected with the title thereto, establishing, granting, or conveying the right and easement to construct and maintain said dam and ditch on and across said survey 105.

"(16) That search of the minutes, records, and files of the county court and the commissioners' court of Washington county as aforesaid, and the records and files of Bexar and Tom Green counties as aforesaid, fail to show anything indicating that the county or commissioners' court of said Washington county had consented to or objected to the construction, maintenance, or extension of said dam and ditch, or anything in the said records or among said papers and files prior to September, 1876, showing that the said county or commissioners' court of Washington county had any notice or knowledge of the existence of said dam and ditch on said land prior to said date.

"(17) That at or about the time said dam and ditch were located and work begun thereon, F. C. Taylor, the owner of said Bismark farm, left Benficklin to go to Brenham on business in connection with the right of way for the said dam and ditch.

"(18) That said F. C. Taylor was a prudent and careful man in his business transactions, looking after them closely.

"(19) That at or about the time work was progressing on said dam and ditch, one McNeese, county surveyor of Washington county, came to Tom Green county and ran out the lines to the four leagues of Washington county school land and established the corners thereof.

"(20) That there is in the files and papers in the commissioners' court of Washington county, without any file mark thereon, a letter written by C. D. Foote, deputy county surveyor of Tom Green county, dated at Benficklin, Tex., September 23, 1876, and addressed to I. B. McFarland, county judge of Washington county, and which letter is as follows:

"'Benficklin, Tex., Sept. 23, 1876.

"'I. B. McFarland, Co. Judge Washington Co.—Sir: Yours in answer to a letter from this office is at hand and we will answer your questions in their order.

"'There is not much timber on the land. The principal part is mesquite, but we think the most of it has been cut over for wood to supply Ft. Concho. The principal damage done is by causing so many sprouts and brush to grow. Thereby making it difficult to clear, besides robbing the land of all timber large enough for fence posts. From appearances this has been carried on for a number of years and a portion of the land is now very brushy. Next the river on either side is large and small pecan, but a great deal of that from 4 to 6 inches has been cut for pickets, of which nearly all the houses in this vicinity are built.

"'There is more than an average proportion of arable land on the tract. That on the west side of the South Concho being, I think, nearly all of that class, though some of it lays quite high. Spring creek runs across the back end of these latter, and is a stream large enough to irrigate say 1,000 acres. Pecan creek marked on the map as running across the East tract, is only a paper stream, and affords no water most of the time. As to how much of the land can be irrigated, I cannot say without an instrument survey, but should you wish to have this done, will make the survey on both sides of the Concho for $100 and on Spring creek for $50, making the maps and profiles. Should it prove as I think it will, that the lands on both streams can be irrigated, it will add very much to the value of the land, and such a survey will be an excellent investment for the county.

"'As to its present values, I am not able to give you any definite answer without knowing what part can be irrigated, but will give you data to form your own conclusion.

"'What is known as the Bismark farm lays next below your land, on the east side of the Concho and the dam from which they take their water is about the center of your land. There is about 3,000 acres of land, and at the time the present owners bought there was about 600 acres in cultivation and with no buildings except Mexican hackels, or mud houses and no fence. They paid for the property $20,000 or

nearly $7 per acre. Since then they have put in the dam, which is on your land and brought about 400 acres in cultivation and now cultivate about 1,000 acres. The farm is not fenced.

" 'Less than a year ago, the land laying below yours on the west side of the river, on Spring branch was sold for $2 per acre. I do not know how much of it can be watered, but think only a small part. Thus you see the value of the land depends on how much can be watered and this can only be determined by an instrumental survey. We shall be glad to answer any questions you may see fit to put, as to mode and cost of irrigating, cost of dam, ditches, etc., and make no charge for such work.

" 'If you want, we may make an arrangement to lease a portion of the tract, the lessee to build the dam and ditches, for the use of the land for a term of years, thereby adding very materially to the value of the land, which is now deteriorating on account of the growth of brush. Another reason is that the water is in limited supply and if the lands above (which being in small tracts will be occupied first) get possession of the water, the river will be dry, and the land comparatively worthless. Should you be willing to make any such arrangement let us know and should opportunity offer we will write you and you can send some competent person to see the land and make arrangements.

" 'Yours, etc.            C. D. Foote,
                " 'Dept. Co. Sur.'

"(21) That said I. B. McFarland was the county judge of Washington county at said time, and he and said Foote are dead and their correspondence cannot be found.

"(22) That in 1878 C. B. Metcalf went to Washington county and leased from the commissioners' court of said county its four leagues of school land, including said survey 105, situated in Tom Green county, for a term of five years from July 1, 1878, and at that time he told said court of the existence of said dam and ditch on said land, and no objection was made thereto, but that they expressed themselves as acquiescing therein.

"(23) That in 1883 the said Metcalf again leased the said lands, and the existence of said dam and ditch was again mentioned, and said court made no objection thereto.

"(24) That said Metcalf in 1885 transferred his lease and thereafter said lands were leased in 1886 by the commissioners' court of Washington county to Seaton Keith, and said Metcalf had no further connection with it until 1894, when he again leased it for a term of ten years.

"(25) That from December 13, 1886, to June 16, 1892, said Metcalf was the owner of said Bismark farm and used said dam and ditch in irrigating said farm.

"(26) That in 1887 the following order was made by the commissioners' court of Washington county on the 9th day of August, 1887, to wit: 'It is ordered by the court that Lafayette Kirk, county judge, be and he is hereby appointed to inquire into and give necessary attention to the matter of irrigation ditches being opened across the school lands of the county located in Tom Green county and to take steps if necessary to protect the county's interest.'

"(27) That at the time of said order Lafayette Kirk was the county judge of said county. That some time thereafter in 1887 or 1888, he came to Tom Green county, went over said land, examined the dam and ditch, and made no objection to its being on the said land.

"(28) That thereafter the county judges and members of the commissioners' court of Washington county on several occasions visited said land, examined said dam and ditch, and made no objection to the same being on the land.

"(29) That plaintiff recognized the right in the owners of said Bismark farm to have, maintain, and operate said dam and ditch on said land, and never questioned the right to do so until about the time of the filing of this suit.

"(30) That said dam and ditch had been continuously used for 35 years for the purpose of irrigating the lands on said Bismark farm at the time of the purchase by defendants, and they would not have purchased but for the easements and rights of using the same in the irrigation of said farm.

"(31) That search in the land office and the office of the Secretary of State has been made for the map designating the route of said ditch, as required by section 6 of the act of March 10, 1875, entitled 'An act to encourage the construction of canals and ditches for navigation and irrigation,' and the map called for in the reports of Henry C. King of May 22, 1876, and the same cannot be found and are believed by the officers of said departments to have been destroyed in the fire which burned the capitol in the year ——.

"(32) That all the parties and owners interested in the acquisition and construction of said dam and ditch have been dead many years, and all of their papers, as well as those of the Benficklin Irrigating & Manufacturing Company, were lost in the flood of 1882 which destroyed the town of Benficklin.

"(33) That defendants are the owners of said Bismark farm under said Taylor and the right and easement in said dam and ditch as appurtenant thereto for the purpose of irrigating said farm.

"(34) That plaintiff has been in continuous possession and use of said survey 105 leasing it to tenants since 1878, and is now in the possession and use thereof by her tenants.

"(35) That said dam and ditch has not in any way disturbed the lessee from Washington county in the use of said land.

"(36) That said dam and ditch are now located and maintained practically where the same were originally located and constructed in 1874.

"(37) That the parties in open court agreed that should judgment be rendered in favor of plaintiff, denying the easement on and over said land, no judgment should be rendered against defendants on the issue of rents; and that, should the court hold that a more minute description of the location of said dam and ditch was necessary to a proper adjudication of the matters involved, either party may have a survey thereof made, and the field notes inserted in the pleading and judgment."

In the main, the findings of fact are conceded to be supported by testimony, and they are adopted by this court as being correct.

L. E. Rasberry, of Brenham, and Blanks, Collins & Jackson, of San Angelo, for appellant. Hill, Lee & Hill and Wright & Harris, all of San Angelo, for appellees.

KEY, C. J. (after stating the facts as above). While, in the well-prepared and satisfactory briefs filed in this court by counsel for the respective parties, other interesting questions are ably presented and discussed, our decision in appellees' favor upon the question of law hereinafter considered renders unnecessary a ruling upon the other questions.

[1] The act concerning private corporations approved April 23, 1874 (Acts 14th Leg. c. 97), granted the right to irrigation companies to construct canals across, along, and upon any stream of water, and, as the Concho river was a navigable stream, this act conferred authority to construct the dam across

that stream. That act did not, in terms, grant a right of way over the public lands, but the act approved March 10, 1875 (Acts 2d Sess. 14th Leg. c. 63), did grant such right in the following language:

"That all corporations for irrigation or navigation are hereby granted the right of way, not to exceed 150 feet in width, over all public, university, school, and asylum lands, with use of necessary rock, gravel and timber for construction purposes, and may obtain the right of way over private lands by contract or under general laws of the state."

And to encourage the construction of such internal improvements that act granted to companies complying with its terms from 6 to 16 sections of land per mile according to the class of the ditch. The undisputed proof shows that the ditch in question was constructed prior to the time our present Constitution went into effect and while the Constitution of 1869 was in force; that upon reports made by Henry C. King, official inspector, showing substantial compliance with the act of March 10, 1875, the state issued to the Benficklin Irrigating & Manufacturing Company, under said act of March 10, 1875, 31 certificates, each for 640 acres of land, which certificates were afterwards located upon the public domain of Texas and patents issued therefor. Under these facts, and by force of the statutes referred to, we hold that appellees acquired the right to construct and maintain the dam and ditch in question.

Counsel for appellant contend that, while the act of March 10, 1875, grants a right of way over "all public, university, school, and asylum lands," it was not intended thereby to grant such right of way over school lands belonging to the several counties of the state. We are unable to yield assent to that construction of the statute. It must be borne in mind that at that time the Constitution of the state read:

"The public lands heretofore given to counties shall be under the control of the Legislature, and may be sold under such regulations as the Legislature may prescribe; and in such case the proceeds of the same shall be added to the public school fund." Section 8, art. 9, Const. 1869.

In view of this constitutional provision, it is reasonable to suppose that the Legislature understood that the Constitution had vested in that body the power of control over county school lands, as well as state or other school lands; and therefore, when it used the language "all school lands," we hold that it was the legislative purpose to include county as well as state school lands.

[2] But, if this construction be adopted, then counsel for appellant earnestly urge that the statute is unconstitutional, the contention being that, as the land here involved had been granted and patented to Washington county in 1852, it was not in the power of the Legislature or of the people, in adopting the subsequent Constitution, to destroy or impair the title so vested in Washington county. Upon this branch of the case we adopt the following excerpt from appellees' brief:

"Appellant contends that, as said land was patented to it in 1852, the Legislature had no power to grant a right of way over it to irrigation companies, and that such right can be acquired only through an express grant from appellant's commissioners' court. In support of its contention, appellant cites the cases of Galveston County v. Tankersley, 39 Tex. 651; Worley v. State, 48 Tex. 1; Milam County v. Bateman, 54 Tex. 153; and Kuechler v. Wright, 40 Tex. 600.

"An examination of the cases cited shows that they are not authority for the propositions asserted. If the grant of the easement made by the acts of 1874 and 1875 had the effect to divest the county of its title in fee to the land, and to divert them to an entirely different purpose, the rule announced in those cases would be applicable. However, here, the acts mentioned grant only an easement without in any manner interfering with the fee in the land, or appropriating the lands to any other or different purpose than that for which they were originally granted.

"In Galveston County v. Tankersley and Worley v. State, it was claimed that the effect of section 8, art. 9, of the Constitution of 1869, was to divest the counties of all title in the lands theretofore granted them, and to reinvest the state with the title in fee thereto. In other words, that by force of the Constitution of 1869 all such lands became a part of the public domain. The court held that the Constitution was not subject to that construction.

"In Milam County v. Bateman, the court held that the Legislature was without power to arbitrarily take from the county its school lands theretofore granted and give them to 'private parties and for private purposes,' as was attempted by the act of July 21, 1870 (Acts Called Sess. 12th Leg. c. 21).

"The correctness of these decisions upon facts in each case may be admitted, but does it follow that, because the Legislature did not have the power to grant these lands to 'private parties and for private purposes,' it therefore did not have the power, under its constitutional control over the lands, to grant an easement thereon for a public use? That it had such power, we think, is too clear for argument.

"It is true in Galveston County v. Tankersley, the court in an obiter dicta expression denies the power of the people through their Constitution to recall its grants of public lands to its counties upon the ground that such grants are protected by the Constitution of the United States, but in Worley v. State, the Supreme Court, speaking through Judge Gould, takes occasion to dissent from that doctrine, saying: 'It is proper to remark that whilst we recognize the authority of the case of Galveston County v. Tankersley, on the question actually decided, to wit, the construction of the Constitution, we are by no means prepared to assent to what is said in the opinion, in that case, denying the power of the state over lands granted by her to her own political subdivisions for public purposes.'

"And in Baker v. Dunning, 77 Tex. 28 [13 S. W. 617], the court held that the provision in section 6, art. 7, Constitution of 1876, granting the prior right to actual settlers residing on county school lands to purchase the same to the extent of their settlements, was not repugnant to the Constitution of the United States, and take occasion, speaking through Judge Gaines, to question the correctness of the decision in Milam County v. Bateman, 54 Tex. 153, on that point, saying: 'In Milam County v. Bateman, 54 Tex. 153, it was held that the state could not take from the counties the lands which had been donated to them for educational purposes. We are of opinion that that decision

should be adhered to. If it were an open question, we might have difficulty in coming to that conclusion. The counties being but political subdivisions of the state and quasi corporations created by the state for the more convenient administration of its laws, we incline to the opinion that they hold their property as they hold their existence—at the will of the state; or that at least what has been given to them by the state for the purposes of government they hold in trust, and that it is subject to be resumed by the state at its pleasure.'

"In Kuechler v. Wright, 40 Tex. 600, the court held that the alternate or even sections of land surveyed by railway companies for the use of the state were 'dedicated to school purposes and placed beyond the power of the Legislature to divert them for any other purpose,' and that the act of August 12, 1870, in so far as it attempted to authorize the homestead settlement or certificate location thereon, was void. In other words, that the title in fee to such lands, having been by law and the Constitutions set aside for such purposes, it was not in the power of the Legislature to divert that land to an entirely different purpose. But notwithstanding the principle of law announced in this case, the Supreme Court, in T. C. Ry. Co. v. Bowman, 97 Tex. 421 [79 S. W. 295], held that the statute of 1879, now article 6432, R. S. 1911, granting to railroad companies an easement of a right of way over such lands, was constitutional and valid; and again in Imperial Irrigation Co. v. Jayne, 104 Tex. 395 [138 S. W. 575, Ann. Cas. 1914B. 322], the court held that the setting aside of such alternate sections of land to the school fund, and providing that they should be sold for that purpose, did not deprive the Legislature of the right to grant easements over the same for the promotion of public enterprises which would enhance the value of that fund, and in that case upheld the validity of the irrigation statutes of 1895 granting to such public enterprises the easement on such lands for the construction of reservoirs, etc.

"From these authorities we deduct the rule that whilst the Legislature was without power to divest the counties of the title in fee to the lands granted for school purposes, and to appropriate them to other and entirely different uses, it did have the power to grant easements thereon for public enterprises.

"But there is another view of this question. The Constitution of 1869 vested the control of these lands in the Legislature to be sold under such regulations as it should prescribe. Other than the act in question, the Legislature had never prescribed any method of acquiring easements over such lands for public purposes. No condemnation proceedings can be had against the state to acquire an easement over these lands for a public purpose without the consent of the state. In lieu of authority for such proceedings, the Legislature grants the easement, and this act was authority to acquire the right thereon in the manner prescribed by the Legislature. In other words, the Legislature, having the power to authorize such companies to acquire by condemnation a right of way for a public purpose, necessarily had the power to grant such easements over the lands under its control.

"The easement for said dam and ditch, being complete at the date of the adoption of the Constitution of 1876, which placed said lands under the control of the commissioners' court, was not affected thereby, nor was it necessary for the owners thereafter to secure any confirmation of the right from appellant, and, the evidence showing that there had never been any abandonment of the easement since its acquisition in 1874 or 1875, appellant was not entitled to an injunction restraining appellees from maintaining the same on said land."

Our present Constitution is much more restrictive than the Constitution of 1869 as to the power of the Legislature to deal with public lands, and yet in construing such restrictions in Imperial Irrigation Co. v. Jayne, 104 Tex. 395, 138 S. W. 575, Ann. Cas. 1914B, 322, our Supreme Court held that the Legislature had the power, which it exercised in passing the irrigation law of March 9, 1895 (Acts 24th Leg. c. 21), to confer easements upon state school lands for the purpose of establishing reservoirs for the conservation of surface waters, and in the course of the opinion prepared by Mr. Justice Dibrell it is said:

"From the view we take of the law it seems to us to be settled by the decisions of this state that the Legislature has power to deal with the public school lands in any manner not inconsistent with the express denial of the Constitution. As stated by Judge Stayton in Smisson v. State, 71 Tex. 233 [9 S. W. 116], in discussing that section of the Constitution, section 4, article 7, invoked in this case in denial of the legislative authority to grant an easement on any portion of the public school lands of the state for dam and reservoir sites: 'A power clearly legislative in its character, not expressly denied to the Legislature, ought not to be held denied by implication, unless its exercise would interfere with, frustrate, or to some extent defeat the exercise of a power expressly granted.'

"It has been held, and it seems with great force of reason, that the purpose of the Constitution was not to restrict the Legislature in dealing with the public school lands further than to say they shall be sold, and that the purpose of the constitutional provision was not to fetter the Legislature with restrictions so narrow as to deprive it of the exercise of that generous and wise policy in dealing with the public domain in order to foster public enterprises and thereby promote the general welfare of the whole people. Such a construction of the Constitution would deny the Legislature the power to authorize the opening of public roads over the public school lands, or the granting of rights of way to railroad companies, or sites for public schoolhouses, or sites for dams or reservoirs to furnish water to the people of our cities located in the arid and semi-arid sections of the state. It would also stop the building of telegraph and telephone lines and cripple the entire commerce of the country."

The language just quoted has equal application to the case at bar, and supports our conclusion that the act of March 10, 1875, conferring a right of way for irrigation ditches across county school lands, was constitutional and valid.

Our ruling as to the validity and construction of the statute referred to renders it unnecessary and therefore we forego any decision upon the other questions in the case.

For the reasons given, we hold that the case was properly disposed of, and therefore the judgment is affirmed.

Affirmed.